[No. H035085. Sixth Dist. Nov. 18, 2010.]

In re C.B. et al., Persons Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Plaintiff and Respondent, v.
C.K. et al., Defendants and Appellants.

**COUNSEL**

Caroline J. Todd, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Lee Gulliver, under appointment by the Court of Appeal, for Defendant and Appellant Father.

Miguel Marquez, County Counsel, and Susan S. Ware, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

**ELIA, J.**—Dependency proceedings (Welf. & Inst. Code, § 300 et seq.)[1] were commenced on behalf of siblings C.B. and M.B. (children) and their older sister C. The juvenile court terminated parental rights as to the children and selected a permanent plan of adoption. (See § 366.26.) Mother C.K. (mother) and father C.B. (father) appeal from the order terminating their parental rights. (§ 395.)

On appeal, mother contends that the judgment terminating parental rights must be reversed because (1) substantial evidence does not support the juvenile court's determination that the parent-child relationship exception did not apply (§ 366.26, subd. (c)(1)(B)(i)), (2) substantial evidence does not support the juvenile court's determination that the Indian child exception did not apply (§ 366.26, subd. (c)(1)(B)(vi)), and (3) adequate notice under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) was not provided to the Choctaw and Seneca tribes. Father joins in these arguments.

On appeal, father contends that the judgment terminating parental rights must be reversed because (1) substantial evidence does not support the juvenile court's determination that the sibling relationship exception did not apply (§ 366.26, subd. (c)(1)(B)(v)), and (2) the court lacked substantial evidence to find that the Santa Clara County Department of Family and Children's Services (DFCS or Department) engaged in "active efforts" to enroll the children in the Cherokee Nation (§ 361.7; Cal. Rules of Court, rule 5.484(c)).[2] Mother joins in these arguments.

We reverse for limited purposes, specifically to allow adequate notice to be provided to the Seneca tribes and to allow the court to determine, under the proper standard, the applicability of the parent-child relationship exception to termination of parental rights.

A. *Procedural History*

1. *Background*

On October 19, 2007, juvenile dependency petitions were filed on behalf of C.B. and M.B. They alleged jurisdiction on grounds of parental failure to protect (§ 300, subd. (b)) and no provision for support (§ 300, subd. (g)).

On October 23, 2007, amended juvenile dependency petitions (§ 300, subds. (b) & (g)) were filed on behalf of the children. On November 14,

---

[1] All further unspecified statutory references are to the Welfare and Institutions Code.

[2] All further references to rules are to the California Rules of Court.

2007, second amended juvenile dependency petitions (§ 300, subd. (b)) were filed on behalf of the children.

On December 31, 2007, third amended petitions (§ 300, subd. (b)) were filed on behalf of the children. The petitions alleged the following facts.

Mother had been incarcerated on October 18, 2007, and father was serving a 19-year prison sentence. On October 19, 2007, an emergency response social worker had placed the children in protective custody pursuant to a custody warrant. The protective custody warrant was issued because mother had left the children in the care of her boyfriend who was an inappropriate caretaker. The boyfriend had a significant criminal history and physical limitations that impeded his ability to care for the children. The children reported that the boyfriend slept all the time and drank beer. The boyfriend was facing eviction from a trailer park.

On October 1, 2007, an emergency response social worker had found the trailer home cluttered and large piles of debris outside. Sewage was leaking into the home due to a sewage system problem in the RV park. The trailer's condition presented a health hazard to the children that placed them at substantial risk.

Mother had substance abuse problems and mental health issues impeding parenting. She had admitted smoking marijuana and consuming alcohol and she was depressed and sleeping all day. Her untreated mental health issues placed the children at substantial risk of harm.

Mother was not meeting the children's basic needs. Their older sister C. had not attended school from September 24, 2007, to October 19, 2007, and she had previous unexcused absences. The children were usually dressed in dirty clothing and unkempt. The children were sometimes responsible for getting up and getting themselves to school in the morning, which involved crossing a major busy intersection without adult supervision.

On May 1, 2007, law enforcement had found the trailer in disarray with debris, clothing, trash and dirty dishes around. The refrigerator was "overrun with mold, mildew, and the smell of spoiled food." Law enforcement found a "marijuana pipe next to the door, a water marijuana pipe on the counter next to the children's clothing, and a broken glass drug pipe in the medicine cabinet above the toilet." The shower was covered with items and appeared unavailable for use. The children had been placed in protective custody and mother had been charged with cruelty to a child and the charges were pending.

The Gardner Family Care Center had been involved with the family since August 2, 2007. The family had been offered differential response services

through the center and the center had provided intensive weekly services, which had not stabilized the family.

According to the petitions, mother had a criminal history that included a DUI (driving under the influence) and driving without a license conviction on December 12, 2006, second degree burglary, petty theft, and false personation. Charges of false imprisonment and being drunk in public against mother were also pending. Father had committed violence against mother and had been arrested for domestic violence on December 24, 2004.

The jurisdiction/disposition report, filed February 21, 2008, reported six prior referrals to child welfare for the family between January 2002 and July 2007. The children had been placed in a foster home. Their older sister C. had been placed in a group home.

The third amended dependency petitions were amended on their faces to delete the allegation that mother was charged with child endangerment and to instead state that mother had pleaded no contest to contributing to the delinquency of a minor pursuant to Penal Code section 272, subdivision (a), and was awaiting sentencing.

After the jurisdiction hearing, the juvenile court found the allegations of the third amended petitions, as amended, true and found the children were described by section 300, subdivision (b). At the disposition hearing, the court adjudged the children dependent children of the court. It ordered family reunification services for mother and, under section 361.5, subdivision (e), it ordered the DFCS to not provide family reunification services to father. The court ordered supervised visits two times a week for mother and supervised visits four times a year, with prison approval, for father.

On July 23, 2008, following the six-month status review, the court ordered the children to continue under the care, custody and control of the DFCS in foster placement and ordered the children and mother to continue receiving services from the family reunification program. The court ordered supervised visits of two hours twice a week for mother and supervised visits four times a year, with prison approval, for father.

The status review report for the 12-month hearing provided the following information about mother. She had not maintained contact with the social worker and had missed several scheduled appointments. Mother had not enrolled in the recommended advanced parenting program because she had not met with the social worker for several months. Mother had not attended individual counseling despite referrals for therapists and she had not complied with drug testing. Mother had stated she was attending AA/NA (Alcoholics

Anonymous/Narcotics Anonymous) meetings regularly but she had not provided meeting attendance sheets and she had not provided contact information regarding her sponsor. Mother had failed to engage in an outpatient drug program as recommended. Mother had attended most of the classes for a domestic violence support group but had not obtained a certificate of completion.

On January 8, 2009, following the 12-month review, the court terminated family reunification services for mother. It ordered the children to continue under the care, custody and control of the DFCS for placement with an approved relative or nonrelative extended family member. The court ordered supervised visits of two hours once a month in the county in which the children resided for mother and supervised visits four times a year, with prison approval, for father.

On June 15, 2009, the court held a hearing for purposes of ensuring compliance with ICWA notice requirements.

On September 9, 2009, mother's counsel told the court that mother needed the court's assistance with maintaining contact with her children, who were residing with their aunt and uncle in Bakersfield. Mother's counsel reported that mother could not reach the children by phone and their caretakers were not taking her calls. The court indicated that mother was entitled to talk to the children at least once a week and the caregivers were required to make the children available for that contact. The court ordered parents to be present at a contested section 366.26 hearing scheduled for October 28 and 29, 2009.

2. *Section 366.26 Hearing*

The juvenile court admitted into evidence and considered the "366.26 WIC Report" (dated May 7, 2009), four addendum reports (a report dated May 7, 2009; a report dated Aug. 17, 2009, and signed Aug. 12, 2009; a report dated Aug. 17, 2009, and signed Aug. 14, 2009; and a report dated Oct. 28, 2009), the curricula vitae of social worker Eva Jones-Ransom (Ransom) and ICWA expert Sean Osborn, the declaration of Sean Osborn, and two ICWA response letters.

The "366.26 WIC Report" provided the following history. Between October 2007 and December 2008, mother always attempted to attend the twice-a-week supervised visits with the children but was often late due to transportation issues. The supervisors of the visits reported that mother was appropriate with the children and the children appeared to enjoy the visits. The children's older sister C. attended many of those supervised visits but "did not attend the visits regularly due to conflicts in her school schedule and other activities."

In January, after visitation had been reduced to once a month and before the children moved to Bakersfield, mother visited with the children. In February, mother received transportation funding and traveled to Bakersfield for a visit under the supervision of the paternal aunt. During the February visit, mother reportedly threatened to use a mortar to blow up the DFCS building in San Jose. No visit was scheduled for March because the court had issued a temporary restraining order.

The report stated that mother and maternal grandmother C.K. had maintained regular phone contact with the children. The children had not had regular contact with their older sister C. The whereabouts of the sister C. were not known at the time of the report.

The aunt and uncle had "provided for all the children['s] needs" and had "continued to provide exceptional care for the children in the home" and the family had "demonstrated that they are very capable [of] caring for the children's needs." The family was "very patient, and loving towards the children," "very attentive" and able to give them "needed individual attention." The report stated that the children were "well bonded and attached to their caretakers" and "are secure and happy children" with them. It indicated that C.B. expressed love for his caregivers, he was excited about and content with being adopted by his aunt and uncle, and he believed he would be happy in their care. M.B. had felt relief that she would remain in their home with her brother. It was reported that the children had thrived in their current placement.

The May 7, 2009 addendum report provided the following additional information. The paternal aunt reported to social worker Kerri Avery, who was then handling the dependency cases, that mother had cancelled the April 2009 visit because mother missed the bus to Bakersfield. Mother failed to contact the Bakersfield social worker who was going to supervise the visit. Mother later explained to Avery that she had cancelled the visit because the bus was going to be more than two hours late.

The addendum report, dated August 17, 2009, and signed August 12, 2009, reported that mother had told the new social worker, Ransom, that she did not visit the children in July because Avery had not provided funds for the bus. Mother had spoken to the children at least once or twice a week. Mother claimed that she was allowed to talk to the children for only a few minutes and the aunt required them to use the speakerphone so she could hear their conversation but the aunt stated that she allowed the children to speak privately. As to older sister C., the report stated that she "continue[d] to be on runaway status most of the time" and was not attending school. Ransom had received a phone call from mother, who said C. was staying with her and C.'s

" 'pimp' was looking for her and had threatened her life if [C.] did not give him $500 dollars." Mother said she did not know the address where C. and she were staying.

The addendum report, dated August 17, 2009, and signed August 14, 2009, provided updated ICWA information.

The October 28, 2009 addendum report indicated that the aunt and uncle's family and the children had moved to their new home and the children were doing well in school. M.B. stated she greatly enjoyed living with her aunt, uncle and cousins. She understood that adoption would mean not having to move again and her aunt and uncle would become her mother and father. M.B. liked visiting with her mother and talking with her on the phone a couple of times a week but indicated that talking with her twice a week was enough. C.B. said he said that he greatly enjoyed living with his aunt and uncle in their new home. He did not want to move anywhere else. He understood that, if he were adopted by his aunt, she would become his mother instead of his aunt. The report stated that mother had visited the children in Bakersfield during August and the visit had gone well.

The section 366.26 hearing took place in late October 2009. M.B., then nine years old, was called as a witness by mother. M.B. had lived with her aunt and uncle since January 2009 and, before that, she had lived in a foster home. Prior to being placed in the foster home, M.B. had lived in a shelter. Before the shelter, she had lived with her mother. At some other time, prior to January 2009, she had lived with her aunt and uncle without her mother. M.B. liked living with her aunt.

M.B. reported that when Avery was their social worker, they would call their mother whenever they wanted to. Now, she was only allowed to call her mother on Monday and Friday. She was always allowed to use the phone to call her mother. M.B. knew her mom's phone number and recited it from memory.

M.B. testified that she would feel mad if she was never permitted to call her mother again or if she was not able to visit her mother again. She testified that she had been looking forward to seeing her mother on this visit to San Jose. She understood that she was going right back to Bakersfield after court that day but said, "I would like to see my mom after court more." She indicated more than once that she would be sad if she was unable to see her mother again. M.B. would not like it if she could not see her mother any more after being adopted.

M.B. indicated that she had fun when her mother and she visited. Her mother usually brought them toys and they would play. She recalled a visit on

her birthday when they played games and talked about her gifts and school. M.B. looked forward to visiting with her mother and sometimes tried to make her something. M.B. recalled being happy during a visit because she was finally able to give her mother a paper with writing and little hearts that she had made but she had forgotten to bring on the previous visit.

M.B. remembered living with her older sister C. for a short time but could not remember where. She wished she could live with C. and missed living with her. She enjoyed seeing her sister but did not know how often she saw her. She indicated that she would be sad if she could not see her sister again.

C.B. was called as a witness by mother. He was 10 years old at the time of the hearing. He had been living with his aunt and uncle since January 2009. The last time he had seen his father was in January 2009 before going to live with his aunt and uncle.

C.B. indicated that he had visited with his mother that morning. He felt sad that he was returning to Bakersfield that day without any more visits. He would like to stay longer to visit again with his mother. Since moving to Bakersfield, he had visited with his mother six times including that morning's visit. During their visits, they "usually talk[ed] and play[ed] around."

C.B testified that they were only supposed to call mother two times a week. Previously, he had been permitted to call more often. He knew and recited his mother's phone number and his grandmother's two phone numbers. He indicated that he liked talking with his mother on the phone, the calls were important to him, and he made sure to get his twice-a-week calls. His aunt had never said no when he said he wanted to call his mother.

When asked how he felt about being adopted by his aunt and uncle, C.B. said, "I feel okay. As long as I could see my parents." When asked how he would feel if he were adopted but did not get to talk regularly with his mom on the phone, he replied, "I wouldn't like it." He would not like it if he were adopted and did not get to see his mother at least now and then. He confirmed that it was important to him to stay in contact with his mother.

C.B. remembered previously staying with his aunt and uncle without his mother for one year. His mother was able to visit and they had phone calls.

C.B. said he could not remember living with his older sister C. but he knew there was a period of time when they lived in the same house. He remembered playing with C. and going to the store with her and C. buying them food. C.B. thought his older sister was an important person in his life because she was his sister. He said he missed living with her and would like

to be able to live with her again. He indicated that both his sisters were equally important because they were family and family was important to him. He indicated that he would be sad if he did not see his older sister again because he was "really close to her."

C.B. confirmed that his mother was also an important person in his life, explaining she was "also family and if it wasn't for her I wouldn't even be here." He said he would be sad if he was not able to see his mother again "[b]ecause I really love her." He enjoyed the time he spent with his mother. C.B. indicated he would be sad if he were unable to see his father again because "he's family and if it wasn't for him I wouldn't even have my name and I wouldn't be here."

Visiting and talking with both his mother and sister were important to C.B. His aunt and uncle allowed him to talk to his mother and sister and he had no reason to think that would ever change. He liked his aunt and uncle and agreed that even if he did not have a house with a big backyard, he would still like them.

The children's maternal grandmother C.K. was called as a witness by mother. Before the children moved to Bakersfield, the grandmother saw them about once every other week and she also saw them during most of the supervised visits with mother. She spoke to the children on the phone a couple of times a week.

Since the children had moved to Bakersfield, grandmother C.K. had rarely seen them. She had visited with them when they had returned to this area for court. She recalled that, during a June visit at the shelter, the children ran to mother and gave her big hugs and mother had hugged and kissed them. The children also hugged their older sister and they were mutually excited to see each other.

Until recently, the grandmother had spoken to the children by telephone whenever they wanted to call her or she called them. Sometimes she was by herself and sometimes she was with mother during her phone contacts with the children. Just recently, they were limited to talking twice a week between 5:00 and 7:00 p.m. on Monday and Friday. A couple of times, when the grandmother had called on days that were not her day to call, she had not been permitted to speak to the children. Grandmother C.K. believed that she would be denied contact with the children if they were adopted.

The grandmother had spoken to both M.B. and C.B. before their arrival in San Jose and they both had sounded very happy about seeing the family. She had seen the children that morning; they had run up and given their mother a hug and kiss.

Sean Hal Osborn, who was recognized as an expert under ICWA, testified on behalf of the DFCS.[3] In his declaration, which was also admitted into evidence, Osborn made clear that ICWA did not, at that time, apply because the children were not Indian children as defined by ICWA. Neither father nor the children were then members of the Cherokee Nation of Oklahoma. He stated that the "active efforts" requirement applies only when a child is an Indian child as defined under ICWA. In any event, he indicated that active efforts had been made and included but were not limited to court-ordered family reunification services for mother, which included basic parenting, individual counseling, drug testing, AA/NA meetings, and a domestic violence support group.

Osborn indicated in his declaration that he had spoken with a representative of the Cherokee Nation of Oklahoma. He had been told that termination of parental rights would not prevent the children from becoming members of the tribe. He also reported that the Cherokee Nation would not be opposed to adoption of the children by paternal relatives. It was his opinion that the Indian child exception did not apply in this case.

Osborn further stated in his declaration that, "[a]lthough the Indian Child Welfare Act does not apply in this case at this point in time, the County had proceeded forward and complied as though this was an ICWA case." He summarized the circumstances and concluded that it was "clear that [C.B.] and [M.B.] would be at risk of serious emotional or physical damage if return[ed] to the care of either parent at this time . . . ." He determined that "termination of parental rights for [those two children] appear[ed] appropriate."

At the hearing, Osborn was directed to answer questions as though ICWA applied even though it was not yet established that the children were Indian children as defined by the act. (See 25 U.S.C. § 1903(4) [defining "Indian child"].) He testified to his opinion that the agency had engaged in active efforts to prevent the breakup of the family and continued parental custody was likely to result in serious physical or emotional damage to the children. According to Osborn, it was very typical for family members to help rear children in the Cherokee community. He was asked hypothetically what position a tribe, such as the Choctaw or Cherokee Nation, would take if the children were members and the tribe were involved in this case. Osborn stated that the tribes prefer that children be placed "either in a guardianship

---

[3] ICWA requires, with respect to Indian children, that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(f).)

or some other continued living arrangement." He indicated the standard policy of the Cherokee Nations was to "not prefer termination of parental rights."

Nevertheless, Osborn recommended termination of parental rights based upon the circumstances from the standpoint of ICWA. He did not, however, consider any other exception other than the Indian child exception to terminating parental rights under section 366.26.

The older sister C. was called as a witness by mother. C. testified that she did not believe the children should be adopted. She did not want her relationship with her brother and sister to end. She had last lived with her brother and sister before October 19, 2007.

The older sister had visited with them for about five minutes that day during a break in the court proceedings and had seen them at the courthouse during their last court date. The last time that she had actually spent time with them was at the children's shelter during a family visit. The children ran to them and hugged and kissed them. She stated, "Our family is always hugging and kissing and we are close." She recalled that M.B. had written a letter to their mother. When it was time to leave, her siblings seemed depressed when they said goodbye to their mother but also happy because they were going to visit with their mother again the next day.

The older sister indicated that she was not able to talk with M.B. and C.B. much by phone. She did not feel that comfortable talking to them on the phone because people were in the background talking to them and telling them what to say to her.

The older sister testified that she was 17 years old, she was not in school, and she did not have a cell phone. She stated that her siblings could get in touch with her through her social worker, who had the phone number of her best friend, with whom she was then living. She had never lived at her aunt's house with her brother and sister. Once, three or four years before the hearing, the older sister had visited her brother and sister at her aunt's house for about a week.

C. remembered when her mother, her brother and sister, and she had all lived together in the same home. She stated that, during that time, she took her siblings everywhere with her. She testified that they were important to her. She said, "They're the closest thing to me. They're, like, basically are me, just a little different people."

C. stated that her aunt did not like her at all. Her aunt did not return her hugs. That day, she had gone over to her aunt, given her a hug, and said "hi,

I love you," but her aunt had said nothing and "just turned around." C. did not think that her aunt would allow her to see her sister and brother if they are adopted.

Social worker Ransom, whom the court recognized as an expert in permanency planning options for children, testified on behalf of the DFCS. She had been assigned to the cases in the latter part of July 2009. She stated that the children appear to be very content and secure in the aunt and uncle's home and "[t]hey seem to be bonded to the aunt and uncle and their cousins." They have been with the aunt and uncle since January 2009 and they expressed to her that they felt part of that family. Ransom had concluded that they were very bonded to the aunt's family and were in a very nurturing environment.

Ransom testified that the children also indicated to her that they would like to have continued contact with their own immediate family and grandmother. Ransom had spoken to the aunt and uncle about the possibility of continuing contact and they recognized that the children would like to continue seeing their mother and grandmother and they had said continuing contact would be possible. The aunt had no objections to, and did not place any limitations on, such contact. Ransom thought continuing phone contact and visitation was a possibility but it would be up to the discretion of the adoptive parents.

Ransom had been once told by the aunt that the children appeared distant and somewhat sad after returning from visiting their mother and it was Ransom's understanding that, before she was involved in these dependency cases, there were times when the children appeared distant and did not listen to their caretaker after they returned from visiting their mother. Ransom was aware that, before she was involved in the case, the aunt had asked for the visits to stop. She was also aware that on more than one occasion both C.B. and M.B. have stated that they enjoy their visits with their mother.

Ransom had heard the testimony that M.B. and C.B. have a relationship with their mother and with their older sister. She also heard C.B.'s testimony about the importance of his relationship with his father. She still believed that adoption was in the children's best interests. She understood that, if adopted, the children had no legal means of having a relationship or visitation with either parent and that contact with the parents would be entirely up to the adoptive parents. Although the aunt and uncle had indicated they planned to continue contact between the children and their parents, Ransom understood that could change in the future.

Ransom stated that the children had been in protective custody for about two years. Before being placed with their aunt and uncle in January 2009, the

children had been in foster care placement. In 2006, prior to the dependency proceedings, they had lived with their aunt and uncle for about a year. According to Ransom, the children view their aunt and uncle as close family and call them aunt and uncle.

Ransom understood that the children wanted to have continued contact with their mother through telephone calls and visits and they would like visits and telephone calls with their mother to continue after adoption. The aunt and uncle had told Ransom that they will continue fostering the children's contact with mother. Ransom did not have any concerns that the aunt and uncle would not facilitate visits between the children and parents.

Ransom acknowledged that the previous social worker had reported that, after the June visit in San Jose, the aunt had told that social worker that she believed that the children's visits with their mother and grandmother were "toxic to the children" and she supported ending visitation and telephone calls. Ransom also acknowledged that another staff person had reported after that visit that the aunt had said that "she felt it would be best to stop the visits." Ransom had not talked to the aunt about those comments. Ransom acknowledged that the aunt had not always indicated that she would support visits. Ransom agreed that she had worked diligently to help "soothe" the situation between the aunt and uncle and mother and the maternal grandmother.

When Ransom took over the case, mother and the maternal grandmother were repeatedly calling for assistance in making telephone contact and Ransom had explained to the aunt that they were entitled to unsupervised phone calls. The aunt indicated calls were coming in throughout the week and the children needed to do their homework and had other responsibilities. Ransom had proposed twice-a-week calls on regularly scheduled days.

Ransom stated that the aunt and uncle were aware that visitation with mother would be entirely voluntary and up to them after adoption. She thought "[i]t would probably be upsetting" to the children if contact with mother ended but she did not know if it would be detrimental to them. She was not sure if it would be harmful to the children to lose all contact with older sister C. because there was not a lot of contact between them.

Ransom believed that the children loved their mother. She believed that they could have a relationship with their parents after parental rights were terminated even if it was not a legal relationship. The aunt had stated that she realized that the children wanted to see and talk to their mother and she had no plans to end that. Ransom did not believe that termination of parental rights would substantially interfere with communication between the children and their older sister.

In Ransom's opinion, a child's statement that he or she loved a parent and would be sad or mad if he or she could never see the parent again was not a compelling reason to not terminate parental rights. It was her belief that parental rights should remain intact only if the parent would be able to safely regain custody of the child. She conceded that there might be situations in which a parent was unable to reunify but parental rights should be preserved. She was aware of the parent-child relationship exception.

Father testified in his own behalf. He disagreed with the recommendation of termination of parental rights for M.B. and C.B. He believed they were "really a close-knit family" and it was "a destructive thing to break up a family like that . . . ." He thought that termination of parental rights would be harmful to those children because "they wouldn't think [he] fought for them." He thought it would be harmful to them if they could not see or talk to their mother and older sister. He was writing the children every week but had not received one letter from them. He was only able to make collect calls.

Father had not signed a postadoption contact agreement.

Mother testified in her own behalf. She saw the children in front of the courthouse on October 28, 2009, and they seemed excited to see her and had come to her and hugged her. Later that morning, she and other family members saw the children upstairs. Later that day, she and other family members had a 30-minute visit with the children at a park.

According to mother, after the children moved to Bakersfield in January 2009, she saw the children one afternoon in February, on two days in mid-June, and for a number of hours on September 26, 2009, and September 27, 2009. Ransom provided her with a train ticket for the September visit. She did not visit them in March, April, May, July or August. She testified that, if her parental rights were not terminated and the aunt and uncle became the children's legal guardians, she would be willing to arrange her own transportation to Bakersfield, to visit in public places outside the home of the legal guardians, and she was willing to have other relatives present during the visits.

Mother acknowledged that the children had previously moved into their aunt and uncle's house on November 20, 2005, and lived there until February 23, 2007. The children had always lived with her before then. She explained that the children went to live with their aunt and uncle because father had beaten her and she was trying to get back on her feet. She took the children back when father was sentenced. She recalled being stopped by officials at different times in different counties and it was her understanding that the aunt was trying to prevent her from taking back custody of her children.

Mother testified that she spoke with the children on Mondays and Fridays and sometimes they snuck in a call with their cousins. They talked about school and what they were doing. They always seemed happy to talk to her.

According to mother, when mother said hello to the aunt on October 28, 2009, the aunt did not respond. Mother stated that the children were receiving father's letters and they were writing to him and giving the letters to their aunt. Mother testified that she wanted the children removed from the aunt's custody if she could not contact her children. Mother indicated that her cheating on father in April 2006 might have affected the way the aunt felt about her.

Mother believed the aunt and uncle loved the children. The children appeared happy and healthy.

Mother had not heard of a postadoption contact agreement until that day and had never signed such an agreement.

### 3. *Decision and Order Terminating Parental Rights*

The court indicated in its statement of decision that it had analyzed the section 366.26 issues as if ICWA applied and used the heightened ICWA standards at trial. The court found by clear and convincing evidence that the children C.B. and M.B. were likely to be adopted. It found "by clear and convincing evidence that the Department made active efforts to provide services designed to prevent the breakup of the Indian family and these efforts have failed." It further found "beyond a reasonable doubt that continued custody with a parent is likely to cause serious emotional or physical damage to the children."

The juvenile court did not find the parent-child relationship exception, sibling relationship exception, or the Indian child exception to termination of parental rights was applicable. It found "by clear and convincing evidence that termination of parental rights" was in the children's best interests.

The court terminated mother's and father's parental rights with respect to C.B. and M.B. It selected adoption as the permanent plan.

### B. *Exceptions to Termination of Parental Rights*

### 1. *Section 366.26*

██ Under section 366.26, the statutory preference is to terminate parental rights and order the child placed for adoption. (§ 366.26, subd. (b)(1).) "The

circumstance that the court has terminated reunification services provides 'a sufficient basis for termination of parental rights unless the court finds a compelling reason for determining that termination would be detrimental to the child due to one or more' of specified circumstances. [Citation.] The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible care-taker.' (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 [93 Cal.Rptr.2d 644].) 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344 [63 Cal.Rptr.2d 562].)" (*In re Celine R.* (2003) 31 Cal.4th 45, 53 [1 Cal.Rptr.3d 432, 71 P.3d 787].)

■ "The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809 [92 Cal.Rptr.2d 20].)" (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534 [41 Cal.Rptr.3d 511]; see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 [103 Cal.Rptr.3d 538].) "The statutory exceptions merely permit the court, in *exceptional circumstances* (*In re Jasmine D., supra*, at pp. 1348–1349), to choose an option other than the norm, which remains adoption."[4] (*In re Celine R., supra*, 31 Cal.4th at p. 53.)

"Reviewing courts have applied various standards of review when considering trial court determinations of the applicability of these statutory exceptions to termination of parental rights." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469 [115 Cal.Rptr.3d 321].) "A finding [that] no exceptional circumstance exists is customarily challenged on the sufficiency of the evidence. (See *In re Jesse B.* (1992) 8 Cal.App.4th 845, 851 [10 Cal.Rptr.2d 516]; *In re Brian R.* [(1991)] 2 Cal.App.4th 904, 924 [3 Cal.Rptr.2d 768].)" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535]; see *In re S.B.* (2008) 164 Cal.App.4th 289, 297 [79 Cal.Rptr.3d 449].)

In *In re Jasmine D., supra*, 78 Cal.App.4th 1339, an appellate court concluded that the abuse of discretion standard, rather than the substantial evidence test, governed its review of a determination that an exception to termination of parental rights did not apply. (*Id.* at pp. 1342, 1351 [parent-child relationship exception].) It stated: "[T]he abuse of discretion standard is not only traditional for custody determinations, but it also seems a better fit in

---

[4] The juvenile court must state its reasons in writing or on the record "[i]f the court finds that termination of parental rights would be detrimental to the child" based on one of the exceptions specified in section 366.26, subdivision (c)(1)(B). (Former § 366.26, subd. (c)(1)(B) [now § 366.26, subd. (c)(1)(D)].)

cases like this one, especially since the statute now requires the juvenile court to find a 'compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1).) That is a quintessentially discretionary determination."[5] (*Jasmine D.*, at p. 1351; see *In re T.S.* (2009) 175 Cal.App.4th 1031, 1038 [96 Cal.Rptr.3d 706] [applying abuse of discretion standard of review to determination regarding Indian child exception].) The appellate court in *Jasmine D.* noted, however, that "[t]he practical differences between the two standards of review are not significant." (*Jasmine D.*, at p. 1351.)

We agree that the abuse of discretion standard governs review but also recognize that the substantial evidence test applies to pure findings of fact. (See *In re Jasmine D., supra*, 78 Cal.App.4th 1351; see also *In re A.A.* (2008) 167 Cal.App.4th 1292, 1322 [84 Cal.Rptr.3d 841].) When applying the deferential abuse of discretion standard, "the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 [76 Cal.Rptr.3d 250, 182 P.3d 579], fns. omitted; see *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339].)

## 2. *Parent-child Relationship Exception*

██ Under section 366.26, subdivision (c)(1)(B)(i), parental rights cannot be terminated where the juvenile court "finds a compelling reason for

---

[5] An abuse of discretion standard has been applied in a variety of child custody situations. In *In re Stephanie M.* (1994) 7 Cal.4th 295 [27 Cal.Rptr.2d 595, 867 P.2d 706], a dependency case, the California Supreme Court stated that the juvenile court exercises its discretion in ruling on a motion for change of placement after termination of reunification services (§ 388), at which point the ultimate question is the best interest of the child, and "the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]" (*In re Stephanie M., supra*, 7 Cal.4th at p. 318.) In *In re Marriage of Burgess* (1996) 13 Cal.4th 25 [51 Cal.Rptr.2d 444, 913 P.2d 473], a family law case, the Supreme Court stated that "[t]he standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. [Citation.]" (*Id.* at p. 32.) Reviewing courts determine "whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child." (*Ibid.*) Subsequently, in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 [12 Cal.Rptr.3d 356, 88 P.3d 81], the Supreme Court determined that, in move-away cases, the "noncustodial parent bears the initial burden of showing that the proposed relocation of the children's residence would cause detriment to the children, requiring a reevaluation of the children's custody," and, "[i]f the noncustodial parent makes such an initial showing of detriment, the court must perform the delicate and difficult task of determining whether a change in custody is in the best interests of the children." (*Id.* at p. 1078.) The courts "exercise their discretion to fashion orders that best serve the interests of the children in the cases before them" (*id.* at p. 1101) and their determinations are reviewed for abuse of discretion (*id.* at p. 1079). In proceedings under section 366.26, the juvenile court is required to act in the dependent child's best interest. (§ 366.26, subds. (c)(1)(B)(v), (vi), (4)(A), (h)(1).)

determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The exception does not require proof the child has a "primary attachment" to a parent or the parent has "maintained day-to-day contact" with the child. (See *In re S.B., supra*, 164 Cal.App.4th at p. 299.)

The exception's second prong requiring that "the child would benefit from continuing the [parent-child] relationship" means that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H, supra*, 27 Cal.App.4th at p. 575.) The juvenile court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Ibid.*) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

 "The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra*, 27 Cal.App.4th at pp. 575–576.)

In this appeal, mother contends that the juvenile court's determination that the parent-child relationship exception did not apply "suffers from many of the same errors" committed by the juvenile court in *In re S.B., supra*, 164 Cal.App.4th 289. She points out that the children had lived with her for many years, the children missed her and were excited to see her, and she had a substantial, positive relationship with them.

In *In re S.B., supra*, 164 Cal.App.4th 289, an appellate court reversed an order terminating the father's parental rights over his daughter, S.B. after concluding that the juvenile court had erred in finding the parent-child relationship exception did not apply. (*Id.* at pp. 293, 301.) In that case, the father had "maintained regular, consistent and appropriate visits with S.B. throughout the dependency proceedings" and they had "an emotionally significant relationship." (*Id.* at p. 298.) The father had been S.B.'s primary caretaker for three years and, when she was removed from his custody, the father "immediately recognized that his drug use was untenable" and he "started services, maintained his sobriety, sought medical and psychological

services," and complied with every aspect of his case plan. (*Ibid.*) The record showed that "S.B. loved her father, wanted their relationship to continue and derived some measure of benefit from his visits." (*Id.* at pp. 300–301.) A Dr. Kelin, who had conducted a bonding study of the father and daughter, testified that, due to their "fairly strong" bond, "there was a potential for harm to S.B. were she to lose the parent-child relationship." (*Id.* at p. 296.) The appellate court concluded that "[b]ased on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [the father]." (*Id.* at p. 301; cf. *In re Amber M.* (2002) 103 Cal.App.4th 681, 689–691 [127 Cal.Rptr.2d 19] [judgment terminating parental rights reversed where experts opined that children had a primary beneficial relationship with parent that clearly outweighed benefit of adoption].)

The same appellate court that decided *In re S.B.* subsequently stated in a different case: "The *S.B.* opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937 [96 Cal.Rptr.3d 625].)

In this case, there was no dispute that the children loved mother and their wish was to continue contact with her. But, unlike *In re S.B.*, there was no testimony from a psychological expert, no less one who had conducted a bonding study, that termination of parental rights would be detrimental to the children. While the court had to consider each child's wishes, it was required to act in each child's best interest (§ 366.26, subd. (h)(1)) and a child's wishes are not necessarily determinative of the child's best interest (see *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1087 [59 Cal.Rptr.2d 575]).

At the time of the section 366.26 hearing in October 2009, M.B. was nine years old and C.B. was 10 years old. They had been in protective custody for about two years and had lived with the paternal aunt and uncle since January 2009. The children had previously lived with them from November 20, 2005, until February 23, 2007, when mother had voluntarily placed them there because she was unable to care for them. The aunt and uncle were providing for the children's daily needs and mother acknowledged that they appeared to love the children. Social worker Ransom found the children were content and secure in the aunt and uncle's home, they were bonded to them and their cousins, and they felt part of their family. The children understood the meaning of adoption, had voiced no objection to adoption, and were thriving in the home of the paternal aunt and uncle. Both had expressed to the social worker that they "greatly enjoyed" living with their aunt and uncle. Mother had never progressed beyond supervised visitation. Ransom did not testify that termination of parental rights would be harmful to the children.

■ The juvenile court determined that the parents no longer served a parental role for the children; rather, the aunt and uncle met their everyday needs. Appellants contend that the court incorrectly focused on the aunt and uncle's provision of day-to-day care. This appellate court and others have stated that "[t]o meet the burden of proving the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827 [86 Cal.Rptr.2d 739].)" (*In re I.W, supra,* 180 Cal.App.4th at p. 1527.) The juvenile court was entitled to evaluate the strength and quality of the children's relationship with their mother and could properly observe that the children's daily needs were being met by the aunt and uncle. Its comments do not demonstrate that it was improperly requiring mother to have day-to-day contact with the children or to be the primary attachment for application of the parent-child relationship exception. "A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51 [82 Cal.Rptr.2d 426].)

In this case, the juvenile court implicitly found that there was substantial, positive emotional parent-child attachment despite the lack of day-to-day contact. The court observed that the children were "of an age where they are intellectually and emotionally aware of whom their parents are." It stated: "The Court had [the] opportunity to observe the children in the presence of their parents, and there is no doubt that the children love their parents and would choose to be with their parents if at all possible. It was clear to the Court, by the eye contact and the smiles, that the children were happy to be sitting in the same room as the parents. The Court heard the children testify that they would be 'mad' and 'sad' if they were not able to have contact with their mother, though they also testified that they would like to be adopted and do not want to move from their current home. The children testified that they have been assured by their aunt that even if they are adopted, they will be able to continue having phone calls and visits with their mother." The court also observed that "[t]hese children know their parents as their parents" and "view [them] as their parents . . . ."

The court then moved on to the weighing process. The court recognized that, "given the ages of the children, . . . the Court's analysis of the benefits of adoption compared to the benefits of maintaining the parent-child relationship is slightly different than it would be if the children were infants or toddlers." It found that "these parents have very little to offer these children except for the loving connection that currently exists between them."

The juvenile court ultimately concluded that "[t]he overwhelming benefits to children that accompany the permanent plan of adoption—stability, security, permanence—are not easily outweighed, and they are not outweighed in this case." It reached that conclusion based, at least in part, upon the expectation that the children's aunt and uncle would permit the children to have continued contact with mother after they were adopted.

The court stated: "There is no evidence that that [loving] connection [between mother and the children] would be severed if the Court were to terminate parental rights. The Court cannot see that terminating parental rights would 'greatly harm' the children pursuant to *In re Brittany C.* Instead, the children will have the best of both worlds. They will have stability, predictability, nurturing, love and warmth in their adoptive home; and because they are placed with relatives, they will maintain the connection to their parents."[6]

Appellants argue that evidence of past visitation and phone call problems "demonstrates the aunt will likely stop the contact . . . ." This argument is essentially a request that this court reweigh the evidence, which we cannot do. In applying the substantial evidence test, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947 [124 Cal.Rptr.2d 688].) "Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 576.)" (*Ibid.*) Here, both the children and social worker Ransom indicated that the aunt would permit contact between the children and mother to continue.

Citing *In re S.B., supra,* 164 Cal.App.4th 289, appellants next argue that, in evaluating the parent-child relationship exception, "it is improper . . . for the court to rely on a belief the relatives will maintain the children's relationship with [mother]." In *In re S.B.,* the juvenile court "recognized that S.B. would benefit from continuing her relationship with [the father] and based its decision to terminate parental rights in part on the grandparents' willingness to allow [the father] to continue to visit S.B." (*Id.* at p. 300.) The appellate court concluded that a parent should not be "deprived of a legal

---

[6] In *In re Brittany C.* (1999) 76 Cal.App.4th 847, 853 [90 Cal.Rptr.2d 737], this court stated: "*Autumn H.*'s requirement that the parent prove that the child would be *greatly* harmed by termination of parental rights must be seen in context. Where a parent has failed to reunify with his or her child, and the juvenile court has found that the child is likely to be adopted, then the burden shifts to the parent to show exceptional circumstances. (*In re Brian R., supra,* 2 Cal.App.4th 904, 923–924.) To require that the parent need only show some, rather than great, harm at this stage of the proceedings would defeat the purpose of dependency law . . . ."

relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents." (*Ibid.*)

We agree that in this case, as in *In re S.B.*, the juvenile court injected an improper factor into the weighing process, namely, the prospective adoptive parents' willingness to allow the children to have continued contact with mother. It is important to remember that once the legal parent-child relationship is permanently severed by termination of parental rights, a substantial, positive emotional attachment between a child and a parent has no legal protection even if depriving the child of that attachment by disallowing contact would greatly harm the child.[7] "In dependency proceedings, an order terminating parental rights is not only conclusive and binding upon the birth parents, but also effectuates a complete and final legal termination of the parental relationship. (Welf. & Inst. Code, § 366.26. subd. (i); *In re Angelia P.* (1981) 28 Cal.3d 908, 915–916 [171 Cal.Rptr. 637, 623 P.2d 198]; *In re Robert J.* [(1982)] 129 Cal.App.3d 894, 904–905 [181 Cal.Rptr. 188].) The parent-child relationship enjoys no legal recognition after termination of parental rights. (*In re S.B., supra,* 164 Cal.App.4th 289, 300.)" (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1391 [105 Cal.Rptr.3d 521].)

■ We conclude that if a juvenile court determines that a parent has "maintained regular visitation and contact" (§ 366.26, subd. (c)(1)(B)(i)), that there is a "substantial, positive emotional attachment" between child and parent benefitting the child (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575), and that the benefit from continuing that parent-child relationship in a tenuous placement "promotes the well-being of the child to such a degree as to outweigh" the benefit that child would gain from the stability and permanency of adoption (*ibid.*), then the parent-child relationship exception is established. In those circumstances, the court cannot nevertheless terminate parental rights based upon an unenforceable expectation that the prospective adoptive parents will voluntarily permit future contact between the child and a biological parent, even if substantial evidence supports that expectation. The purpose of the parent-child relationship exception is to protect the parent-child relationship when its continuation is more beneficial to the

---

[7] Although the Legislature has declared that "some adoptive children may benefit from either direct or indirect contact with birth relatives, including the birth parent or parents . . . , after being adopted" and has recognized postadoption contact agreements (Fam. Code, § 8616.5, subd. (a)), such agreements are entirely voluntary (see Fam. Code, § 8616.5, subds. (a), (b); see also Welf. & Inst. Code, § 366.26, subd. (a) ["Section 8616.5 of the Family Code is applicable and available to all dependent children meeting the requirements of that section, if the postadoption contact agreement has been entered into voluntarily."]). Even where there is an agreement for postadoption contact with a biological parent, the subsequent refusal of an adoptive parent to comply with the agreement does not affect the adoption. (See Fam. Code, § 8616.5, subd. (e)(1) [a postadoption contact agreement must contain a warning that "the adoption cannot be set aside due to the failure of an adopting parent . . . to follow the terms . . ." of the agreement].)

dependent child than a permanent plan of adoption and, in such case, a court cannot leave the protection of such a relationship dependent upon the hoped-for goodwill of the prospective adoptive parents.

We will remand to allow the court to reconsider, under the proper legal standard, whether the evidence establishes that the parent-child relationship exception applies.

### 3. *Sibling Relationship Exception*

An exception to termination of parental rights exists where a "court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); see *In re L. Y. L., supra,* 101 Cal.App.4th at pp. 951–952.)

 "Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.] Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption. (*In re L.Y.L.*[, *supra,*] 101 Cal.App.4th 942, 952–953 . . . .)" (*In re Celine R., supra,* 31 Cal.4th at p. 61.)

In this case, both children testified to the importance of their relationship with their older sister C. The court recognized that they had been raised together for much of their lives and had shared common experiences. The court observed that the three siblings each testified to a close bond but they had not lived together for some time. The court stated that "[C.]'s current circumstances prevent her from being much of an emotional support to [C.B. and M.B.] She has been on the run since June 2009, has not been attending school, is reported to be pregnant, and has been unwilling to comply with any court orders to return to placement. Though the children all clearly love one another, it is difficult for the Court to conclude that ongoing contact with [C.]

outweighs the benefits of adoption." The court concluded that the parents had not established the sibling relationship exception.

 Appellants assert that there is no indication in the record that "the stability and permanence that the children had with [their aunt and uncle] would be adversely affected" by implementing a permanent plan of guardianship rather than adoption. Even if the aunt and uncle could provide the children with a stable and permanent environment through legal guardianship, once the court has found it is likely the children will be adopted, "the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child." (*In re Celine R., supra,* 31 Cal.4th at p. 53; see § 366.26, subd. (a) ["The procedures specified herein are the exclusive procedures for conducting these hearings . . . ."].)

Appellants further contend that the court lacked substantial evidence to support its finding that the benefits of adoption outweighed the benefit of continuing the children's sibling relationship with their older sister C. The "366.26 WIC Report" indicated that C. had attended many of the visits with her mother and siblings between October 2007 and December 2008 but only irregularly due to conflicts with school and other activities. Since the children's placement with their aunt and uncle in January 2009, there had not been regular contact between the children and C. and C. had not visited with them. It was also reported that C. had "not maintained phone contact with her siblings." In fact, at the time the report was prepared, C.'s whereabouts were unknown. An addendum report, signed August 12, 2009, stated that C. "continue[d] to be on runaway status."

When C. appeared at the section 366.26 hearing in late October 2009, her testimony confirmed that she did not talk with M.B. and C.B. much by phone. Thus, despite the strength of their feelings for each other, C. had been largely absent from the children's lives since they had been placed with their aunt and uncle in January 2009. She had not lived with her siblings since they and she were taken into protective custody on October 19, 2007. Before the dependency, the children had previously lived with their aunt and uncle for over a year but C. had never lived with her brother and sister at her aunt's house. There was no evidence that, if the children were not adopted, but instead placed in legal guardianship, C. would be able to live with them or would be in closer contact with them.

 Appellants contend that the court erred in considering C.'s activities and noncompliance with its orders. The juvenile court could properly consider the strength and quality of the children's sibling relationship with C.

and whether ongoing contact was in their best interest. (§ 366.26, subd. (c)(1)(B)(v).) The fact that the court mentioned C.'s current circumstances did not mean it was improperly focusing on C.

Appellants point to court-ordered psychological evaluations attached to an addendum report filed in July 2008 for the sixth-month review, which were not before the court at the section 366.26 hearing. Although those earlier psychological evaluations indicated the children's regular sibling visitation with C. was important and should be maintained, appellants did not present any expert evidence to that effect at the section 366.26 hearing. In any event, the court recognized that the children's sibling relationships with C. were significant relationships that were important to the children. But, at the time of the section 366.26 hearing, when adoption of the children was under consideration, social worker Ransom could not say that the children would be harmed if they lost all contact with older sister C. because there was not a lot of contact between them.

The juvenile court could reasonably conclude, based on the evidence, that, even if adoption would interfere with the children's sibling relationships with C., the benefit of continuing those relationships with C. was outweighed by the benefit of adoption and, therefore, the sibling relationship exception to termination of parental right did not apply.[8]

## 4. *Indian Child Exception*

An exception to termination of parental rights exists where the juvenile court "finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he child is an *Indian child* and there is a compelling reason for determining that termination of parental rights would not be in the best interest of the child, including, but not limited to: [¶] (I) Termination of parental rights would substantially interfere with the child's connection to his or her tribal community or the child's tribal membership rights. [¶] (II) The child's tribe has identified guardianship, long-term foster care with a fit and willing relative, tribal customary adoption, or another planned permanent living arrangement for the child." (§ 366.26, subd. (c)(1)(B)(vi), italics added.)

---

[8] The determination that the sibling relationship exception is inapplicable does not necessarily prevent postadoption sibling contact with C. (See Fam. Code, § 8616.5; Welf. & Inst. Code, § 366.26, subd. (a); see also Welf. & Inst. Code, §§ 366.3, subd. (g)(7) [report for § 366.3 hearing after termination of parental rights must include "[w]hether the final adoption order should include provisions for postadoptive sibling contact pursuant to Section 366.29"], 366.29, subd. (a) ["With the consent of the adoptive parent or parents, the court may include in the final adoption order provisions for the adoptive parent or parents to facilitate postadoptive sibling contact."].)

Even though the children did not meet the statutory definition of an "Indian child," the court analyzed the section 366.26 issues as if the ICWA applied "[o]ut of an abundance of caution." It concluded, based upon information provided by ICWA expert Osborn that "termination of parental rights will not interfere with the children's membership rights" or their connection to the tribe and the tribe would not oppose the planned adoption by paternal relatives in this case.

Appellants assert that the juvenile court erred in finding that the Indian child exception did not apply by "focus[ing] only on the Cherokee Nation" and by "terminating parental rights before at least the children's enrollment was completed." They point out that the children appear to have both Choctaw and Cherokee heritage and the court did not have any information whether termination of parental rights would interfere with their potential Choctaw membership. They also complain that Osborn's conversation with a representative of the Cherokee Nation was hearsay and "[t]he Cherokee Nation did not authorize [him] to determine the membership status in the tribe." They further claim that the evidence before the court did not show that the Cherokee Nation would prefer adoption over legal guardianship for these children. Without citing any authority, they insist that "tribal membership of the children should be resolved before parental rights are terminated."

 Appellants have not cited any authority permitting the court to postpone the section 366.26 hearing for some unknown period to allow time for the children to become members in some Indian tribe and, thereby, qualify as Indian children under federal law. At the 12-month review hearing after expiration of the standard period for family reunification services, the juvenile court has limited options. (§ 366.21, subd. (g); see § 361.5, subd. (a)(1).) Where there is no basis for continuing the case for up to six months for a permanency review hearing (§ 366.21, subd. (g)(1); see § 361.5, subd. (a)(3)) and no basis for determining that "there is a compelling reason for determining that a hearing held pursuant to Section 366.26 is not in the best interest of the child because the child is not a proper subject for adoption and has no one willing to accept legal guardianship" (§ 366.21, subd. (g)(3)), the only statutory choice remaining to the court is to "[o]rder that a hearing be held within 120 days, pursuant to Section 366.26 . . . ." (§ 366.21, subd. (g)(2).)

 As far as any hearsay objections are concerned, they were waived by the failure to object below. (Evid. Code, § 353; see *In re Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341, fn. 7.) Further, " ' "[i]t is settled law that incompetent testimony, such as hearsay or conclusion, if received without objection takes on the attributes of competent proof when considered upon the question of sufficiency of the evidence to support a finding." ' [Citations.]" (*People v. Panah* (2005) 35 Cal.4th 395, 476 [25 Cal.Rptr.3d 672,

107 P.3d 790].) "[W]hen inadmissible hearsay . . . is admitted without objection, [Evidence Code section 140's definition of 'evidence'] makes it clear that it constitutes evidence that may be considered by the trier of fact." (Cal. Law Revision Com. com., 29B pt. 1 West's Ann. Evid. Code (1995 ed.) foll. § 140, p. 15; cf. *McDaniel v. Brown* (2010) 558 U.S. ___, ___ [175 L.Ed.2d 582, 130 S.Ct. 665, 672] (*per curiam*) ["a reviewing court must consider all of the evidence admitted at trial when considering a *Jackson* [insufficiency of the evidence] claim"].)

Appellants also assert that Osborn's declaration did not show that termination of parental rights would not "substantially interfere" with the children's ability to become members of the Cherokee Nation because the representative's statement, which was quoted in his declaration, did not state that membership could be finalized after termination of parental rights. We observe that ICWA expert Osborn testified that, according to his conversations with the Cherokee tribe, it was his understanding that termination of parental rights did not prevent the children from becoming members of the tribe. As stated, on review, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts." (*In re L. Y. L., supra,* 101 Cal.App.4th at p. 947.)

Finally, a parent claiming an exception to termination of parental rights has the burden of proof. (See, e.g., *In re Scott B., supra,* 188 Cal.App.4th at p. 469; *In re I.W., supra,* 180 Cal.App.4th at p. 1527; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252 [98 Cal.Rptr.2d 844]; *In re Jasmine D, supra,* 78 Cal.App.4th at p. 1350; see also *In re L. Y. L., supra,* 101 Cal.App.4th at pp. 952, 954; Evid. Code, §§ 115 [" '[b]urden of proof' means the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court"], 190 [" 'Proof' is the establishment by evidence of a requisite degree of belief concerning a fact in the mind of the trier of fact or the court."].) "The burden of producing evidence as to a particular fact is initially on the party with the burden of proof as to that fact." (Evid. Code, § 550, subd. (b).) The " '[b]urden of producing evidence' means the obligation of a party to introduce evidence sufficient to avoid a ruling against him on the issue." (Evid. Code, § 110; see 2 McCormick, Evidence (6th ed. 2006) Burden of Proof and Presumptions, § 336, p. 471 ["The burden of producing evidence on an issue means the liability to an adverse ruling . . . if evidence on the issue has not been produced."].) Here, appellants did not introduce evidence sufficient to make a prima facie showing that the Indian child exception applied. (§ 366.26, subd. (c)(1)(B)(vi).) The juvenile court properly concluded that the exception did not apply.

## C. *Active Efforts*

 Appellants argue that the juvenile court and DFCS failed to comply with ICWA's "active efforts" requirements. Section 1912, subdivision (d), of the ICWA provides: "Any party seeking to effect a foster care placement of, or termination of parental rights to, an *Indian child* under State law shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912(d), italics added.) In California, the ICWA's "active efforts" requirement is implemented by section 361.7.[9]

 Section 366.26 expressly states that "[t]he court shall not terminate parental rights." "[i]n the case of an Indian child" if "[a]t the hearing terminating parental rights, the court has found that active efforts were not made as required in Section 361.7." (§ 366.26, subd. (c)(2)(B).) Although the phrase "active efforts" is not defined by either federal or state statute, California courts have construed "active efforts" to be "essentially equivalent to reasonable efforts to provide or offer reunification services in a non-ICWA case . . . . (*In re Michael G.* [(1998)] 63 Cal.App.4th [700,] 713–714 [74 Cal.Rptr.2d 642].)" (*Adoption of Hannah S.* (2006) 142 Cal.App.4th 988, 998 [48 Cal.Rptr.3d 605]; see *Letitia V. v. Superior Court* (2000) 81 Cal.App.4th 1009, 1016 [97 Cal.Rptr.2d 303].) There is no claim in this case that active efforts to provide or offer mother remedial services and rehabilitative programs, aimed at *preventing the family's breakup*, were not made.

Rather, appellants' argument is that the court lacked substantial evidence to support a finding that the Department used active efforts to pursue the children's enrollment in the Cherokee Nation.[10] This contention is based on rules 5.484(c)(2) and 5.482(c). Rule 5.484(c) states: "In addition to any other

[9] Section 361.7 states: "Notwithstanding Section 361.5, a party seeking an involuntary foster care placement of, or termination of parental rights over, an *Indian child* shall provide evidence to the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (§ 361.7, subd. (a), italics added.) The section further provides: "What constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers." (§ 361.7, subd. (b).) For purposes of California dependency proceedings, "Indian child" is generally "defined as provided in Section 1903 of the Indian Child Welfare Act (25 U.S.C. Sec. 1901 et seq.)." (§ 224.1, subd. (a).)

[10] In October 2007, mother indicated in a parental notification of Indian status form that the children were or might be members of, or eligible for membership in, a Cherokee tribe. In November 2007, father indicated in a parental notification of Indian status form that he was or might be a member of, or eligible for membership in, a Cherokee tribe.

required findings to place an Indian child with someone other than a parent or Indian custodian, or to terminate parental rights, the court must find that active efforts have been made . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and must find that these efforts were unsuccessful. [¶] (1) The court must consider whether active efforts were made in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's tribe. [¶] (2) Efforts to provide services must include *pursuit of any steps necessary to secure tribal membership for a child if the child is eligible for membership in a given tribe*, as well as attempts to use the available resources of extended family members, the tribe, tribal and other Indian social service agencies, and individual Indian caregivers." (Italics added.) Rule 5.482(c) further provides that "[i]f after notice has been provided as required by federal and state law a tribe responds indicating that the child is eligible for membership if certain steps are followed, *the court must proceed as if the child is an Indian child* and direct the appropriate individual or agency to provide active efforts under rule 5.484(c) to secure tribal membership for the child." (Italics added.)

Initially, it must be pointed out that the statutory "active efforts" requirements under federal and state statute apply only to an "Indian child" as defined by the ICWA. (25 U.S.C. §§ 1903(4), 1912(d); Welf. & Inst. Code, §§ 224.1, subd. (a), 361.7.) The children were not Cherokee Indian children under the ICWA, even though the Cherokee Nation's response indicated they were eligible for membership, since they were neither members of the Cherokee Nation nor were they biological children of a member of the Cherokee Nation. (25 U.S.C. § 1903(4).) Moreover, the ICWA's "active efforts" mandate does not require a juvenile court to proceed "as if" a child is an Indian child when a noticed tribe's response indicates that the child is eligible for membership if certain steps are followed. (See 25 U.S.C. § 1912(d); see also Welf. & Inst. Code, § 361.7.) We question whether rule 5.482(c) and rule 5.484(c) are consistent with the controlling statute.[11]

Further, to the extent appellants may be attacking earlier dependency proceedings on the ground that the court failed to proceed *as if* the children were Indian children and direct the Department to provide active efforts to secure tribal membership for the children in the Cherokee Nation, those earlier orders are not reviewable on this appeal. (See *In re A.A.*, *supra*, 167 Cal.App.4th at p. 1318.) The juvenile court did proceed as if the children were Indian children at the section 366.26 hearing by making the necessary findings.

---

[11] Under the California Constitution, the Judicial Council may not adopt rules that are "inconsistent with statute." (Cal. Const., art. VI, § 6, subd. (d).) Section 265 provides: "The Judicial Council shall establish rules governing practice and procedure in the juvenile court not inconsistent with law."

In any event, the record supports the conclusion that the Department made reasonable efforts to pursue "any steps necessary to secure tribal membership for a child if the child is eligible for membership in a given tribe." (Rule 5.484(c)(2).) The Department received a letter, dated June 12, 2008, from the Cherokee Nation advising that the children could be traced in the tribal records through an enrolled paternal ancestor (a great-great-great-great-great-grandfather) and that relationship made the children "eligible for enrollment and affiliation with Cherokee Nation by having direct lineage to an enrolled member." It stated that the Cherokee Nation could not intervene unless the children or eligible parent applied and received membership.

The letter was attached to an addendum, filed July 23, 2008, to the six-month status review report. In the addendum report, the social worker stated that she "ha[d] completed the registration documents for the Cherokee Nation Tribe" and was "awaiting their Certificate of Degree of Indian Blood." In another addendum report, also filed July 23, 2008, the social worker indicated that birth certificates for paternal relatives were needed and that, on July 2, 2008, she had notified the paternal grandmother, paternal aunts, and father of the needed documents and she was "awaiting the family's compliance in providing" them.

The June 12, 2008 letter from the Cherokee Nation was also attached to the 12-month status review report. The 12-month status review report reiterated that the Cherokee Nation had confirmed that the children may be eligible for enrollment in the tribe. Social worker Avery reported that she had been "working with the paternal relatives to obtain the needed documentation to prove the lineage from enrolled member to the children." She indicated in the report that the paternal grandmother was no longer cooperating with documentation efforts but another relative had obtained needed documents and the social worker had sent the application packet back to the Cherokee Nation on December 4, 2008. She had been informed by the Cherokee Nation that the enrollment process could take up to seven months.

A letter from the Cherokee Nation, dated December 17, 2008, was attached to the "366.26 WIC Report," dated May 7, 2009. The letter advised that the children's membership applications were required to be accompanied by "State Certified Birth and/or Death Records for all individuals tracing back" to an enrolled member and, consequently, the photographic copies were being returned along with the applications.

In the "366.26 WIC Report," Avery gave this update: "As stated in the 12 month Status Review report dated 12/17/08, the children may be eligible for enrollment in the Cherokee Nation. On 12/17/08, the Cherokee Nation notified this worker that the children's application would be kept on file,

however State Certified Birth/Death Certificates were needed for all individuals to establish lineage to the enrolled tribal member. This worker notified the paternal grandmother [O.G.] and requested original birth certificates and/or death certificates for the family members to establish lineage to the register[ed] tribal members. This worker has not received any of the original documents needed to enroll the children in the tribe. Ms. [G.] has indicated to this worker in a letter dated 11-5-08 that she will not be providing the documents as she does not believe the children should be enrolled in the tribe and has withdrawn her own enrollment from the tribe."

At a May 7, 2009 hearing, the deputy county counsel stated, with respect to the applications to the Cherokee Nation, that the social worker had been trying to get the birth and death certificates from the family but had not obtained them yet. The deputy county counsel remarked that "if the family does want to enroll and wants to enroll the children, then I think they will need to work with the tribes directly to see if there's anything that can be done about missing records."

The record of the hearing on June 15, 2009, indicates that the children's paternal great-aunt V.C. had obtained certified copies of birth and/or death certificates from different states, including Texas and Oklahoma, to support the children's Cherokee Nation applications. After a discussion indicating some confusion regarding whether the tribe wanted originals or certified copies, the deputy county counsel stated that "if the tribe comes back and says certified copies are appropriate, then at that time we are wondering if she would provides these because you can always get more certified copies." When the court stated that it assumed that the social worker "would have to figure out where to get [the certified copies], pay the money and take the time to do that," the deputy county counsel replied, "No, it's their application. It would have to come from them, the certified copies." The paternal great-aunt unsuccessfully attempted to give the documentation that she had obtained to the court. The deputy county counsel indicated that the paternal great-aunt should send the documents to the tribe and agreed that the Department would provide the address. The court indicated that it saw no problem with the paternal great-aunt sending the documents and that the deputy county counsel would provide needed information. The paternal great-aunt left the courtroom. The deputy county counsel indicated that the social worker would prepare a cover letter for the great-aunt's signature specifying the case number and the children's names and providing the great-aunt's address so that the tribe could contact her if it had further questions.

An addendum report, dated August 17, 2009, prepared by social worker Ransom who had recently taken over the dependency cases, stated the following with regard to efforts to enroll the children as members of the

Cherokee Nation. It stated: "On 8/13/09, the undersigned received a letter regarding the children . . . from the Cherokee Nation stating that they can be traced in the tribal record of the Cherokee Nation. . . . This relationship makes the children, eligible for enrollment and affiliation with the Cherokee Nation by having direct lineage to an enrolled member." A letter and an "Application for Citizenship in the Cherokee Nation" were attached to the report. The application instructions explain that to obtain a certificate of degree of Indian blood, the applicant "must apply and provide documents that connect [the applicant] to an enrolled lineal ancestor . . . ." The application instructed: "If no one in the family has received certification, attach ORIGINAL STATE CERTIFIED DOCUMENTS (BIRTH/DEATH) CERTIFICATES beginning with the applicant back to the enrollee." The social worker stated in her report that she would complete the membership applications for the children.

At a hearing on Monday August 17, 2009, the deputy county counsel stated that "one tribe, the Cherokee Nation of Oklahoma, has said the children may be eligible for enrollment under certain circumstances, which include the rest of the paternal line enrolling in the tribe." Paternal great-aunt V.C. indicated to the court that social worker Avery had prepared a cover letter for her and mailed it to her the previous Friday but V.C. had not yet picked it up from the post office. Consequently, she had not yet mailed the cover letter and the birth and death certificates to the Cherokee Nation. There was no indication that V.C. was not going to follow through with mailing the documents to the Cherokee Nation once she picked up the cover letter.

On October 28, 2009, at the contested section 366.26 hearing, the court indicated that it had "received countless letters from a paternal relative named [V.C.] around the Indian Child Welfare Act." It was the court's understanding that she was "attempting to get the family registered" but had "not yet gotten herself registered." The deputy county counsel indicated that she had no personal knowledge.

Although appellants now complain that the juvenile court "failed to direct the Department to complete necessary enrollment documents so that their tribal membership could be realized," the record indicates that the Department did immediately complete and submit membership applications on behalf of the children. After the Cherokee Nation indicated that membership applications must include "State Certified Birth and/or Death Records for all individuals tracing back" the direct lineage to the enrolled ancestor, the Department worked with the family to obtain the supporting documentation. The social worker first attempted to obtain the needed documentation through the paternal grandmother, who withdrew her cooperation. By the time of the June 15, 2009 hearing, however, paternal relative V.C. had obtained birth and

death certificates. Although there was some confusion at that hearing about who was responsible for sending that supporting documentation to the Cherokee Nation, the record indicates that, before the August 17, 2009 hearing, the Department had sent V.C. a cover letter to enable her to send the birth and death certificates to the Cherokee Nation. At that August 17, 2009 hearing, it appeared that V.C. would be mailing them once she picked up the cover letter from the post office.

The Department's ongoing efforts to work with family members to obtain the supporting documentation and its provision of the cover letter to a cooperative and willing extended family member were consistent with taking the "steps necessary to secure tribal membership" for eligible children and attempting to use "the available resources of extended family members" as stated in rule 5.484(c)(2). The Department was not required to do more under the circumstances. Although appellants assert that a deputy county counsel "erroneously informed the court that the children could only be enrolled in the Cherokee Nation if all of their paternal relatives were also enrolled," the apparent misstatement had no bearing on the adequacy of the efforts made by the agency.

Appellants insist that the Department should have tried to obtain the state-certified copies of the birth and death certificates itself. They contend that "the Department failed to conduct even a minimal amount of investigation to ascertain that the records the tribe required were available to non-family members." They assert that, because California and other states, such as Oklahoma, make birth and death records available with a court order, the Department might have been able to directly secure the supporting documentation. Even if that were possible, we think it is unreasonable to interpret rule 5.484(c)(2) as requiring the DFCS to use its limited resources to attempt to obtain numerous certified copies of birth and death certificates from various states to support a membership application of a dependent child.

Further, we have no reason based on the record before us to conclude that the Cherokee Nation does not have the children's applications or that V.C. did not promptly follow through by mailing the birth and death certificates after the August 17, 2009 hearing, using the cover letter prepared by a social worker. The record does not disclose that the Department failed to take any reasonable steps necessary to secure tribal membership for the children and substantial evidence supports the court's "active efforts" finding.

D. *Adequacy of ICWA Notices*

1. *Notice Requirement*

The ICWA provides that, "[i]n any involuntary proceeding in a State court, where the court *knows or has reason to know* that an Indian child is involved,

the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a), italics added.) California law implements the ICWA by requiring that notice be sent to the minor's parents and the minor's tribe whenever "it is *known or there is reason to know* that an Indian child is involved [in a Indian child custody proceeding], and for every hearing thereafter . . . unless it is determined that the Indian Child Welfare Act (25 U.S.C. Sec. 1901 et seq.) does not apply to the case in accordance with Section 224.3."[12] (§ 224.2, subds. (a), (b), italics added; see § 224.1, subd. (c); 25 U.S.C. § 1903; rules 5.480, 5.481(b).) Notice must "be sent to all tribes of which the child may be a member or eligible for membership, until the court makes a determination as to which tribe is the child's tribe in accordance with subdivision (d) of Section 224.1, after which notice need only be sent to the tribe determined to be the Indian child's tribe."[13] (§ 224.2, subd. (a)(3).)

Under the implementing federal regulation, the required ICWA notices must include "[a]ll names known, and current and former addresses of the Indian child's biological mother, biological father, maternal and paternal grandparents and great grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers, and/or *other identifying information*." (25 C.F.R. § 23.11(a), (d)(3) (2010), italics added.) California law requires that the notices contain substantially the same data, including "*any other identifying information, if known*." (§ 224.2, subd. (a)(5)(C), italics added.) The Judicial Council has prescribed a mandatory form, entitled "Notice of Child Custody Proceeding for Indian Child (Indian Child Welfare Act)" (ICWA-030 [new Jan. 1, 2008]). (See Gov. Code, § 68511.)

In this case, appellants contend that the order terminating parental rights of both mother and father must be reversed because the ICWA notices contained incomplete and incorrect information with respect to the children's potential membership in the Choctaw and Seneca tribes.

---

[12] The ICWA provides that "[n]o . . . termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary . . . ." (25 U.S.C. § 1912(a).) California law generally requires that "[n]o proceeding shall be held until at least 10 days after receipt of notice by the parent, Indian custodian, the tribe, or the Bureau of Indian Affairs . . . ." (§ 224.2, subd. (d); see rule 5.482(a)(1).) The Indian child's tribe has a right to intervene at any point in a proceeding for the termination of parental rights. (25 U.S.C. § 1911(c); Welf. & Inst. Code, § 224.4; see rules 5.482(e), 5.534(i).)

[13] California law also requires that, to the extent required by federal law, notice "be sent to the Secretary of the Interior's designated agent, the Sacramento Area Director, Bureau of Indian Affairs." (§ 224.2, subd. (a)(4).)

## 2. *Choctaw*

The "366.26 WIC Report" filed by the DFCS social worker indicated that she had been notified by the paternal grandmother O.G. that the children might be eligible for enrollment in the Choctaw Nation. The social worker had notified the Choctaw Nation in December 2008 and received a response in January 2009.

The December 2008 ICWA notice for C.B. named "Jennie Wingate," "Billy Jackson," and "Phebe Wingate" as paternal great-great-grandparents. It stated Billy Jackson's enrollment number was 9905 but gave no enrollment number for "Phebe Wingate." The December 2008 ICWA notice for M.B. named "Jennie Wingate" as her paternal great-great-grandmother and named "Billy Jackson" and "Phebe Wingate" as paternal great-great-great-grandparents. It gave the same enrollment number for Billy Jackson and, in addition, gave an enrollment number of 9906 for "Phebe Wingate." The notices were sent to the Choctaw Nation of Oklahoma.

A letter from the Choctaw Nation of Oklahoma, dated January 6, 2009, regarding the Indian status of the children and their older sister C. stated that it had researched its records with the information provided and had been unable to establish Indian heritage. The letter explained that, under its constitution, all lineal descendants of Choctaw Indians whose names appear on the final rolls of the Choctaw Nation were members. It also stated, "Please note that all records are pulled by maiden names and date of birth, therefore, the lack of this information may hinder the process."

In the "366.26 WIC Report," the DFCS social worker further reported that she had received a letter in January 2009 from the children's paternal grandmother O.G. The letter indicated that her father's death certificate omitted his parents' names and she was in the process of having the death certificate amended to show that his parents were Lee Andrew Bynum and Jennie Jackson. The social worker received another letter in February 2009 indicating that the grandmother had an appointment to speak with a lawyer about her father's death certificate but, at the time of the report, had not received any further information from her.

On June 15, 2009, at the hearing held to specifically deal with ICWA notice issues, father's counsel indicated that she had spoken with the paternal grandmother, who had said that her mother was married to a man, "Purvis [*sic*] Bynum," whose mother was Jenny Jackson. In addition, the grandmother O.G. had said that Jenny Jackson was married to a Levi Bynum. She had also said that Jenny Jackson's mother was Phoebe Jackson, whose Choctaw enrollment number was 9906 or 1906, and Phoebe was married to Henry Jackson, whose Choctaw enrollment number was 1905 or 9905.

ICWA notices of the pending section 366.26 hearings were mailed in July 2009 to, among others, the Sacramento area director of the BIA (Bureau of Indian Affairs), the Secretary of the Interior, Choctaw Nation of Oklahoma, the Jena Band of Choctaw Indians in Louisiana, and the Mississippi Band of Choctaw Indians. The notices named "Jennie Wingate Bynum" in the relative information section but did not identify her relationship to the children. They also named the children's paternal great-great-great-grandmother as "Phoebe Wingate Jackson" with a Choctaw enrollment number of 9906 or 1906 and their paternal great-great-great-grandfather as "William Henry Jackson" with an enrollment number of 9905 or 1905.

Appellants contend that the July 2009 notices failed to provide legally adequate notice to the Choctaw tribes because they did not correctly identify the children's great-great-grandmother as having the maiden name of Jennie Jackson and as being the daughter of Phoebe Wingate Jackson and William Henry Jackson. They also argue that the notices, in addition to providing only the name "Jennie Wingate Bynum," failed to specify her relationship to the children and, consequently, failed to "connect the children's lineage to the Choctaw ancestors."

By letter stamped July 22, 2009, the United States Department of the Interior, Bureau of Indian Affairs informed the DFCS that its records showed that neither Billy Jackson, roll No. 9905, nor Phoebe Jackson, roll No. 9906, ever had any children. The letter indicated that they "did not find a Jennie Wingate Bynum enrolled." By letter dated July 28, 2009, the Jena Band of Choctaw Indians informed the DFCS that its records did not indicate that the children or their relatives were members or eligible for membership in the Jena Band. Letters from the Mississippi Band of Choctaw Indians similarly stated that the children and the parents were neither enrolled nor eligible for enrollment.

Here, the notices provided the tribes with a meaningful opportunity to determine the children's possible Choctaw heritage based upon their purported Choctaw great-great-great-grandparents. Any asserted error in failing to provide a maiden name of "Jennie Jackson" and identify her as the children's great-great-grandmother in the notices was necessarily harmless since any purported Choctaw heritage was asserted to be through direct lineal descent from enrolled members Billy Jackson and Phoebe Jackson and the BIA's records established that those members had no children. (*In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576 [79 Cal.Rptr.3d 189] ["where notice has been received by the tribe . . . , errors or omissions in the notice are reviewed under the harmless error standard"].)

### 3. *Seneca*

Appellants assert that the DFCS should have sent corrected notices to the Seneca tribes before the section 366.26 hearing because previous notices to which the tribes responded had incomplete and incorrect information. They claim the January 2008 notice, which listed the children's maternal great-grandmother with a last name of "Senna," was prejudicially defective because it did not list her as having any tribal affiliation and stated "N/A" for "Tribe, band and location," which they claim indicated she had no Seneca heritage.[14] They further assert that the July 2009 notice similarly failed to demonstrate Seneca heritage because it did not provide the name "Senna" for the children's maternal great-grandmother and did not specify the maiden names for the children's mother or grandmother. In any event, they point out the July 2009 notice was not sent to the Seneca tribes. Respondent counters that adequate notice was sent to the Seneca tribes, which found the children were neither members nor eligible to enroll, and "[t]here is no more information that the Department could have provided that would have brought a different answer from the Seneca tribes."

In a parental notification of Indian status form, filed in October 2007, mother indicated that she might have Seneca Indian ancestry in addition to the children possibly being members or eligible for membership in a Cherokee tribe but she did not identify any particular Seneca tribe. The court ordered ICWA notice to be given by the social worker.

An ICWA notice sent in November 2007 identified the children's mother as Seneca and Cherokee. It named the children's maternal grandmother C.K. and listed the maternal great-grandmother as "Elsie Margaret Hamilton." As to that great-grandmother's tribe or band and location, the notice stated "N/A." A maternal great-grandfather, Pasquali Sarpi, was identified as "Cherokee, Sennca [*sic*]." The notice was sent to, among others, the BIA in Sacramento, the Cayuga Nation of New York, the Seneca-Cayuga Tribe of Oklahoma, the Seneca Nation of Indians in New York, and the Tonawanda Band of Senecas in New York.

By letter dated November 29, 2007, the Seneca-Cayuga Tribe indicated that the children, their sister C., and their parents were neither members of the tribe nor eligible for membership.

---

[14] They also assert that the notices sent to the Seneca tribes misidentified a maternal great-grandfather as being Seneca and Cherokee. Even assuming that the grandfather was not Indian, appellants have failed to show that the error was prejudicial. (Cf. *In re Cheyanne F., supra*, 164 Cal.App.4th at pp. 573–574, 576 [complete omission of information regarding non-Indian side of the family was harmless error].)

Another notice was sent to the same recipients on January 10, 2008, and again identified the children's mother as Seneca and Cherokee. It provided a more complete name for the maternal grandmother and listed the maternal great-grandmother as "Elsie Margaret Hamilto [*sic*] Senna." It again stated with regard to that great-grandmother's band or tribe and location, "N/A." A maternal great-grandfather, Pasquali Sarpi, was again identified as "Cherokee, Sennca."

A letter dated January 14, 2008, from the Seneca Nation of Indians quoted its enrollment ordinance, which made clear that membership was based upon matrilineal descent and eligibility to enroll was available only to those persons whose mother is a member of the Seneca Nation. It found the children and their older sister C., mother and father, their grandmother C.K., Elsie Margaret Hamilton, and other named relatives were not enrolled members of the Seneca Nation of Indians and were not eligible for enrollment.

In a letter dated February 1, 2008, the Tonawanda Seneca Nation stated that the children, their sister, and their parents were not members and they were not eligible for membership. In a letter dated March 10, 2008, the Cayuga Nation stated the children's parents did not have ancestry with the Cayuga Nation and the parents, the children, and sister C. were not eligible for enrollment.

On May 20, 2008, further ICWA notices were sent to, among others, the Sacramento area director of the BIA, the Secretary of the Interior, the Cayuga Nation of New York, the Seneca-Cayuga Tribe of Oklahoma, the Seneca Nation of Indians in New York, and the Tonawanda Band of Senecas in New York. The maternal great-grandmother was listed as both "Elsie Margaret Senna" and "Elsie M[a]rgaret Hamilton." Her birth date and birthplace were also listed. Her tribe or band was listed as unknown. A maternal great-grandfather, Pasquali A. Sarpi, was again listed but, this time, his tribe or band was listed as unknown.

By letter dated October 28, 2008, the Seneca Nation of Indians again confirmed that the children, mother and father, and other named relatives were neither enrolled members nor eligible to enroll.

ICWA notices regarding the 12-month review hearing set for December 17, 2008, were sent to the Sacramento area director of the BIA and the Secretary of the Interior but not to any Seneca tribe.

At a hearing on May 7, 2009, the children's maternal grandmother C.K. stated that her parents were not enrolled members of any Seneca tribe but the grandmother stated that her aunt was a member and lived on a reservation in Arizona. The court acknowledged that a corrected notice might have to be sent.[15] C.K. indicated that her mother's maiden name was Senna and her mother's grandmother's married name was Chase. C.K. said that she could not remember her great-grandmother's maiden name and would have to check her records, which were in storage. The deputy county counsel asked for a hearing at which parents and other relatives would bring all identifying information because "so many different items [had been] sent at different times" and she did not know what information was correct. The court accepted that suggestion and ordered the parents to appear on June 15, 2009, for the purpose of ensuring proper ICWA notice.

At the June 15, 2009 hearing, father's counsel informed the court that, prior to the hearing, maternal grandmother C.K. had said that her paternal grandfather, George Senna, "at one point he may have had relations" with a woman that was "[N]ative American and had children" but C.K. had not known the name of the Native American woman or the names of any children resulting from their relationship. Grandmother C.K. then spoke up, stating that her grandfather was George Senna (the children's great-great-grandfather) and she had heard that his father (the children's great-great-great-grandfather) married an Indian woman after his first wife, who was not Indian, passed away. She had been told by her older sister that when men married Indians, "they take on the wife's name." The grandmother then stated, "So I am not sure which way other than they have children. That could be where [the name] Senna came in, those children." When the court asked whether she was descended from the first wife or second wife and indicated some confusion, C.K. stated she was "very confused too."

In July 2009, ICWA notices regarding the section 366.26 hearing were sent to the Sacramento area director of the BIA and the Secretary of the Interior but not to any Seneca tribe.

■ As previously stated, under California law, notice must generally be sent to "all tribes of which the child *may* be a member or eligible for membership . . . ." (§ 224.2, subd. (a)(3), italics added.) The phrase "all

---

[15] The maternal grandmother never provided the court with the name of her maternal aunt, who was not the children's lineal ancestor, and did not bring her up again at the June 15, 2009 hearing. None of the noticed tribes received notice in Arizona. We have no reason to believe on this record that the DFCS did not adequately inquire into the grandmother's claim.

tribes" in subdivision (a)(3) of section 224.2 has been "construed as requiring notice to *all* federally recognized tribes within the general umbrella identified by the child's parents or relatives." (*In re Alice M.* (2008) 161 Cal.App.4th 1189, 1202 [74 Cal.Rptr.3d 863] [notice to all federally recognized Apache tribes required]; see *In re J.T.* (2007) 154 Cal.App.4th 986, 993–994 [65 Cal.Rptr.3d 320] [notice to all of the federally recognized Cherokee and Sioux tribes required].)[16]

We are not persuaded by appellants' claim that the January 2008 notice was defective because "N/A" was entered in the space for the tribe or band of the children's maternal great-grandmother Elsie Margaret Hamilton Senna. The record does not establish that the great-grandmother was affiliated with any particular Seneca tribe or band. The abbreviation "N/A" or "N.A." or "NA" can mean "not available" as well as "not applicable."[17] (See Webster's 9th New Collegiate Dict. (1990) p. 1380; Prince's Bieber Dict. of Legal Abbreviations (6th ed. 2009) p. 420; "N/A" <http://www.all-acronyms.com/N/A> [as of Nov. 18, 2010]; see also Evid. Code, § 451, subd. (e).) The January 2008 notice provided the great-grandmother's name and birth date. Appellants have not affirmatively shown that the "N/A" entry as to the grandmother's tribe or band in the January 2008 notice rendered it defective and prevented meaningful notice to the Seneca tribes.

Furthermore, the Seneca tribes were again given notice in May 2008 and the notices stated the children's maternal great-grandmother's married name and her maiden name of "Elsie Margaret Senna," her birth date and place, and indicated that her tribe or band was "unknown" rather than "N/A." The notified Seneca tribes did not respond and revise their prior determinations. "A determination by an Indian tribe that a child is or is not a member of or eligible for membership in that tribe . . . shall be conclusive." (§ 224.3, subd. (e)(1).) There is no basis for supposing that the notified Seneca tribes'

---

[16] California appears to impose more demanding notice requirements than does ICWA. Under federal regulations, notice to the child's tribe is only required where the identity and location of the child's tribe is known. (25 C.F.R. § 23.11(a) (2010).) Conversely, where the identity or location of the child's tribe cannot be determined, notice of the pendency of any involuntary child custody proceeding involving an Indian child in a state court must be sent to the appropriate area director of the BIA. (25 C.F.R. § 23.11(b) (2010).) Subdivision (d) of section 224 commands that "[i]n any case in which this code or other applicable state or federal law provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child, or the Indian child's tribe, than the rights provided under the Indian Child Welfare Act, the court shall apply the higher standard."

[17] We note that the July 2009 notice states "No information available" in the space for the tribe or band of the children's maternal great-grandmother.

determinations regarding the children's ineligibility for membership might have been erroneous due to incorrect information regarding that great-grandmother's tribe or band.

Appellants also contend that the notices to the Seneca tribes "lacked some of the known information regarding maternal ancestors" and, therefore, new notices should have been sent to them before the section 366.26 hearing. At the June 15, 2009 hearing to collect all information necessary for proper ICWA notice, maternal grandmother C.K. theorized that the father of her grandfather George Senna (the children's great-great-grandfather) might have taken the name "Senna" from a second Indian wife and the surname "Senna" might have come into the family through their children. But the grandmother did not actually provide the name of her great-grandfather (the children's great-great-great-grandfather) or his second wife to the court or did not seem to know whether she was related to the second wife. The grandmother admitted to being very confused and was unable to provide any concrete information regarding the supposed Seneca ancestor. The grandmother's conjecture did not require the Department to send new notices that included the children's great-great-great-grandmother whose name was uncertain. But information concerning the children's great-great-grandfather George Senna was not previously included in the notices sent to the Seneca tribes. " '[T]o establish tribal identity, it is necessary to provide as much information as is known on the Indian child's direct lineal ancestors.' (25 C.F.R. § 23.11(b) (2003).)" (*In re Karla C.* (2003) 113 Cal.App.4th 166, 175 [6 Cal.Rptr.3d 205].) This additional information should have been provided to those tribes before proceeding with the section 366.26 hearing. (See §§ 224.2, subd. (a)(5)(C), 224.3, subds. (e), (f); cf. 25 C.F.R. § 23.11(b), (d)(3) (2010).)

## DISPOSITION

The December 17, 2009 order terminating parental rights and selecting adoption as the permanent plan is reversed for the limited purposes of providing adequate ICWA notice to the Seneca tribes and allowing the court to reconsider, under the proper legal standard, whether the parent-child relationship exception to termination of parental rights applies (§ 366.26, subd. (c)(1)(B)(i)). Upon remand, the juvenile court shall direct that proper notice, including all known maternal direct lineal ancestors, be given to Seneca tribes and the BIA in accordance with California law and the ICWA. Following at least 10 days after receipt of such notice, if no Seneca tribe intervenes, the court shall determine whether the parent-child relationship exception to termination of parental rights applies (§ 366.26, subd. (c)(1)(B)(i)). If no Seneca tribe has intervened and the court determines that the parent-child relationship exception is inapplicable, the court shall

reinstate the order. If the court determines that the parent-child relationship exception does apply, it shall hold further proceedings under section 366.26 to select the children's permanent plan. If any Seneca tribe intervenes, the court shall hold a new section 366.26 hearing in accordance with applicable law.

Rushing, P. J., and Premo, J., concurred.

On November 18, 2010, the opinion was modified to read as printed above.