Filed 2/3/14  In re M.G. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.G., a Person Coming Under the Juvenile Court Law. | H039782 (Santa Clara County Super. Ct. No. JD20740) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. M.R., et al., Defendants and Appellants. | |

## I.  INTRODUCTION

In this juvenile dependency matter regarding M. (the child), the juvenile court terminated parental rights and selected adoption as the permanent plan pursuant to Welfare and Institutions Code section 366.26.[1]  Both the mother and father of the child have appealed, contending that the juvenile court erred in terminating their parental rights because the father's relationship with M. satisfied the parent/child relationship exception

---

[1] All further statutory references are to the Welfare and Institutions Code.

to the statutory preference for adoption.  (§ 366.26, subd. (c)(1)(B)(i).)  For the reasons stated below, we will affirm the juvenile court's orders.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Prior Juvenile Dependency Proceedings*

Our summary of the prior juvenile dependency proceedings in this matter is taken from this court's opinion in *M.G. v. Superior Court* (Feb. 4, 2013, H039067) [nonpub. opn.] of which we take judicial notice.  (Evid. Code, § 452, subd. (d)(1).)

### B.    *Section 300 Petition*

On July 29, 2011, the Santa Clara County Department of Family and Children's Services (the Department) filed a petition under section 300, subdivision (b) [failure to protect] and (j) [abuse of a sibling] alleging that M., age seven months, came within the jurisdiction of the juvenile court.

The petition further alleged that M. was at significant risk in the care of her mother and father due to the mother's developmental delays and mental health problems, as well as both parents' inability to adequately meet the child's basic needs and provide adequate supervision for M. and her three siblings.  Previously, all three siblings had been declared dependents of the court.[2]  Although the mother received 12 hours of in-home assistance from the San Andreas Regional Center every day, she was unable to maintain a sanitary home, provide regular meals, or change M.'s diaper without being reminded to do so.  Additionally, she had dropped M. on her face.

Regarding abuse of a sibling, the petition alleged that the family home was unsanitary and unsafe for children, with the presence of "old food with larvae on it which both parents refuse to throw out, buckets of standing water, an excessive amount of

---

[2] In *M.G. v. Superior Court* (Feb. 4, 2013, H039067) [nonpub. opn.], we took judicial notice of this court's opinion in a related appeal, *In re S.G.* (Dec. 20, 2012, H038274) [nonpub. opn.].  In the latter opinion, this court affirmed the juvenile court's order terminating the parental rights of M.'s mother and father with respect to M.'s three siblings, pursuant to section 366.26, subd. (c)(1)(B)(i).

2

cleaning chemicals and exposed electrical cords, all of which are accessible to the child and her siblings." M. and her siblings had also been injured due to the lack of parental supervision. The children played unsupervised in front of the house, which was on a busy street, and M.'s three-year-old brother had pushed M. in her stroller into oncoming traffic.

### C.     Detention Hearing

At the detention hearing held on August 3, 2011, the juvenile court found that (1) M.G. was the presumed father of M.; (2) continuance in the parental home would be contrary to the child's welfare; and (3) continued detention was necessary because removal from the parents' custody was necessary to protect the child's physical or emotional health. The court therefore determined that a prima facie showing had been made that the child came within section 300.

The court ordered that the parents be provided with supervised visitation, with a minimum of two visits per week for a minimum of one hour each visit.

### D.     Jurisdiction/Disposition Report

The Department filed a jurisdiction/disposition report on November 21, 2011. The report stated that M.'s three siblings were placed in protective custody in 2009 and M. was born while the parents were receiving extensive family reunification and family maintenance services. The Department found that the mother, who was the main caretaker for the child, did not provide proper care for M. although the parents were receiving 12 hours of assistance every day from the San Andreas Regional Center.

The report also stated that the family's living situation was unsafe because they were living in a warehouse that was unsanitary due to the mother's hoarding and the presence of unsafe items, including old food with larvae that the parents refused to throw out, buckets of standing water, excessive amounts of cleaning chemicals, exposed electrical cords, soiled clothes on beds, dirty diapers, and garbage throughout the house.

Due to the lack of supervision, M. had suffered at least three falls. The mother had also allowed M.'s three-year-old brother to push her stroller into oncoming traffic, where M. was almost hit by a truck. It appeared that the parents did not want to follow the safety instructions that they had received from the social worker and the in-home assistant.

The father focused on the mother as the problem and was unable to explain why he did not get more involved in caring for the children, even after attending parenting classes and receiving other services to improve his parenting skills. Both parents lacked effective parenting skills, which continued to place the children at risk of harm.

The report noted that the parents were motivated to continue participating in services, noting that they had not missed any visits with the social worker. The parents also enjoyed their supervised visits with the children and interacted with them "properly," although both tended to focus more on the younger children. The children were attached to the parents and enjoyed the visitations.

In the addendum report filed November 21, 2011, the Department reported that M. had been placed in a foster home with her siblings and was doing very well. The Department recommended that the mother not be provided reunification services because she had been unable to learn basic parenting skills to keep M. safe. However, the Department recommended that the father receive family reunification services with respect to M. and the social worker was "hopeful that the father is able to comply with services and reunify with the child."

### E. *Jurisdiction Hearing*

A contested hearing on jurisdiction and disposition was held on November 21, 2011 and December 2, 2011. The December 2, 2011 order stated that the juvenile court found allegations of the amended section 300 petition to be true and declared M. a dependent of the court. Additionally, the court ordered that M.'s placement in the foster

4

home continue; only the father was to receive family reunification services; and both parents were to have weekly supervised visitation for two hours.

### F.    *Interim Status Reviews*

The first interim review of family reunification took place on January 31, 2012. The Department stated in its interim review report that M. was doing well with her caregivers:  she had been placed in a concurrent home with her siblings on December 23, 2011.  The father was engaging in his case plan and his weekly drug tests had been negative.  He visited with M. on a weekly basis and was "appropriate" with her.  The juvenile court ordered that all previous orders remain in effect.

In conjunction with the six-month interim review held on July 10, 2012, the Department submitted its status review report.  According to the report, the father was working full time in his ice cream shop and continuing to live in the warehouse from which the parents' three older children had been removed due to unsafe and unsanitary conditions.  The social worker had conducted home visits and observed that the warehouse was cluttered with clothes, toys and garbage; the bathroom was dirty and consisted only of a toilet and sink, with no hot water; there were openings in the ceiling to the outside; the side door had no lock; electricity was provided by electrical cords run from the father's business next door; the kitchen was dirty and messy, with rotten food; and the bedroom had a king-sized bed surrounded by bags of toys and clothing.

The Department also stated in its six-month status review report that the father had continued to have weekly negative drug tests, had completed the parent orientation class, and had consistently visited M.  While stating that the father had been "appropriate" with M. during visitation, the report noted that he was not interactive with M. during the visits and tended to feed her rather than play with her.  Regarding the warehouse situation, the father continued to live with the mother in the warehouse and did not intend to look for an appropriate home until M. was returned to him.

5

The Department remained concerned by the father's inability to provide a safe home for M., the possibility that M. would be returned to the mother's care if she were to be returned to the father, and his failure to demonstrate that he wanted to actively parent M. Therefore, the Department recommended that the father's family reunification services be terminated and a permanency planning hearing under section 366.26 be set.

Two addendum reports were filed by the Department that included recent photographs of the warehouse where the father lived, and which showed that the warehouse remained unsafe and unsanitary. The Department noted that the father had failed to find adequate housing for nearly one year and had also failed to show that he could meet M.'s basic needs.

A letter from the family enrichment program was attached to the Department's second addendum report. M. had been referred to the program because she had been throwing fits and had exhibited irritable moods and aggressive behavior. M. and the father had met with a mental health rehabilitation specialist on a weekly basis. The specialist wrote that the father and M. had been "engaging in positive bonding activities" and that the father was learning to implement parenting techniques as well as ways to improve child safety in the home. The specialist had observed a "strong" attachment between M. and the father despite the length of their separation.

In its order after hearing on contested six-month status review, filed on July 26, 2012, the juvenile court ordered that M. continue as a dependent child of the court and the father continue to receive family reunification services. The court also ordered the father to participate in and successfully complete counseling regarding relationship issues, weekly drug testing, a 12-step program, a relapse prevention plan, and to cooperate with Family Wellness Court partners. The father was allowed supervised visitation of a minimum of two visits per week for two hours each visit.

### G.    12-Month Status Review

The Department filed its 12-month status review report on November 27, 2012. Since the last status review, the father had moved in and out of a studio apartment and was again living in the warehouse, which remained unsafe and unsanitary. He continued to advise the social worker that he would have adequate housing for M. once she was returned to him.

The Department also reported that the father had complied with weekly drug testing, with the exception of missing one week; was attending a weekly cognitive behavior therapy group; had received services from the Gardner's Family Enrichment Program; had failed to attend an appointment for a transitional housing unit; and had not engaged in the mental health services to which he had been referred by Family Wellness Court. The father had attended supervised visitation of M., where he continued to offer her food from the beginning to the end of the visit.

M. appeared to be "doing well emotionally." She enjoyed getting attention from her caretakers.

Due to the father's procrastination in finding adequate housing and his inability to meet M.'s basic needs, the Department determined that it was not likely that the father would reunite with M. if he were given additional time. The Department therefore recommended that family reunification services to the father be terminated and a section 366.26 permanency planning hearing be set.

In an addendum report dated September 25, 2012, the Department provided an update on the father's housing situation. In September 2012, the father had moved into a transitional housing unit for fathers who are in the process of reunifying with their children. The father was able to live in the transitional housing unit for six months and would lose the housing if he lost family wellness services.

M.'s mother continued to live in the warehouse. The social worker visited the warehouse in September 2012 and found that it continued to be cluttered, unsafe, and

unsanitary. The mother informed the social worker that she does not have time to clean when she comes home from work and the father tells her not to throw anything away. Although the father had told the mother that he wants to clean the warehouse and make it livable, he did not help with cleanup. The mother intended to continue her relationship with the father.

In a second addendum report, dated October 24, 2012, the Department reported on the outcome of the father's participation in 12 months of reunification services and supervised visitation with M. The father had displayed limited parenting skills, including continuing to feed M. fruits and juices that made her sick. He had also given her expired food and had failed to properly change her diaper without reminders. The father also needed to be reminded to watch M., who was now an active toddler, during visitation. The Department found that M. would be at risk of harm if placed with the father, not only due to his limited parenting skills but also because he had failed to maintain a safe and sanitary home. The Department believed that it was "highly probable" that the father would use the mother as a caretaker if M. was returned to him, although the mother was unable to adequately identify risk factors and supervise children.

In the second addendum report, the social worker noted that she "ha[d] not observed a secure attachment" between the father and M. The supervising visitation social worker had likewise observed that M. was "not emotionally attached" to the father. M. would often fail to show any emotion or reaction when brought to her visits with the father. Whereas she was "happy and joyful when interacting with [the social] worker and her caregivers," M. was "often emotionless when visiting with [the father]."

A contested 12-month hearing was held on November 27, 2012. At the conclusion of the hearing, the juvenile court made several findings. First, the court found that clear and convincing evidence showed that the return of the child to the physical custody of the father would create a substantial risk of detriment to the child's safety, protection, and physical or emotional well-being. Although the court believed that the father loved M.

8

and worked very hard to provide for the family, the court found that the father did not have any insights into the problems that had brought him before the court, including his failure to provide a suitable home.

Second, the juvenile court found that there was clear and convincing evidence that reasonable services had been offered to the father and there was no substantial probability that M. would be returned to him in the next six months. The court pointed to the evidence showing that his visits with M. were still supervised and he still needed directions regarding basic child care.

Accordingly, as set forth in the court's order of November 27, 2012, the court ruled that the father's reunification services were terminated; M. would continue her placement in the foster home; the father would have supervised visitation of a minimum of two visits per week for two hours each visit; and the section 366.26 permanency planning hearing would be held on March 26, 2013.

## H.     The Father's Writ Petition

The father filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452[3] on December 31, 2012, seeking relief from the November 27, 2012 order setting the section 366.26 hearing. We denied the petition in an unpublished opinion filed on February 4, 2013. (*M.G. v. Superior Court* (Feb. 4, 2013, H039067) [nonpub. opn.].)

## I.     Section 366.26 Report

In a section 366.26 report dated March 26, 2013, the Department recommended the juvenile court terminate the parental rights of both the mother and the father, and that the court free the child for adoption.

The report reflected that M. was doing well emotionally in her concurrent foster home. She had "bonded well" with her caretakers and appeared "happy in her

---

[3] All further rule references are to the California Rules of Court unless otherwise indicated.

9

placement." She was "attached to the caretakers and call[ed] them mommy and [daddy]." She enjoyed playing with her siblings, who the caretakers were in the process of adopting.

The mother continued to have supervised visits with M. once a week for two hours. The father continued to have supervised visits with M. two times per week for two hours at a time. During the visits, the social worker observed the "common theme of offering M[.] food throughout the visit." M. would seek the social worker's attention during the visits and needed to be "redirected to go with her father." M. separated easily from the father at the end of the visits: she often did not "acknowledge him with a kiss when requested" and would walk away from him indifferently.

The mother and father continued to live together in the warehouse, which continued to be cluttered, dirty, unsafe and unsanitary. While acknowledging the father's love for M., the social worker believed that M. was "in desperate need of safety, attachment and positive parenting interaction in order to thrive." She had "thrived since placed in her concurrent home and ha[d] bonded well with her caretakers." The social worker felt that it was in M.'s best interests to terminate parental rights and give her the opportunity to be adopted.

On March 26, 2013, the mother and father both objected to the permanent plan of adoption and requested a contested hearing.

### J.       Permanency Planning Hearing

The mother and father both testified at the contested hearing on May 21, 2013.

The mother testified that her visits with M. were "going well." She believed that M. responded to the mother and father "as her parents." Although M. often failed to respond when the mother spoke to her, she did engage when the mother played games with her. Mother believed that she and M. had a bond, asserting that M. would hug her, smile at her, and ask to sit on her leg or be carried. The mother noted that M. seemed sad

at the end of the visits, asking why she and the father were leaving. However, the social worker testified that M. had no trouble separating from the mother at the end of visits.

The father also believed he and M. were well-bonded. He felt that M. recognized him "particularly" and that termination of parental rights would have a "negative impact" on M.

The Department argued that although the parents had visited M. consistently, they had not "really parented this child since she was eight months old." The Department referred to the evidence that M., who was then two years old, showed no connection with the parents but rather "sees them as people who come to play with her, bring her food."

The mother and the father both argued that the juvenile court should not terminate parental rights. The father pointed out that since he only saw M. two times per week, it was unsurprising that she had "a more distant relationship" with him than with her caretakers. He argued that the test was not "which person the child runs towards" and that a biological parent had an "extra intangible connection" with his or her child. He also pointed out that the caretakers did not have the same "ethnic heritage" as the parents and thus lacked "the cultural connection" that the father had with M.

The child's attorney indicated she was "in agreement with the [D]epartment's recommendation" and asked the juvenile court to "terminate parental rights and free the child [M.] for adoption."

The juvenile court issued its findings and orders on June 11, 2013. The court found, by clear and convincing evidence, that M. was adoptable and that adoption was in her best interests. It noted that she had been with her prospective adoptive parents for approximately 17 months, that the prospective adoptive parents were in the process of adopting M.'s siblings, and that M. appeared to be thriving in the home. The court noted that the mother and father "to their credit," had been regularly visiting with M., but that they had not been able to establish a parental role with her. The court found that the parents failed to prove, by a preponderance of the evidence, that any of the statutory

11

exceptions to adoption applied, "including the beneficial relationship exception described by Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)." The court terminated parental rights and freed M. for adoption.

### III. DISCUSSION

Both the father and the mother contend that the juvenile court erred in terminating their parental rights because the father's relationship with M. satisfied the parent/child relationship exception to the statutory preference for adoption. (See § 366.26, subd. (c)(1)(B)(i).) Both the father and mother also contend that if we reverse the termination of one parent's parental rights, we must also reverse the termination of the other parent's parental rights.

We will begin with an overview of the legal framework for permanency planning in juvenile dependency cases and the applicable standard of review.

#### A. *Legal Framework for Permanency Planning*

#### 1. **The Preference for Adoption**

The California Supreme Court has stated that "[t]he objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time. [Citations.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

"When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family. [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52 (*Celine R.*).) Where reunification efforts have failed, " 'the court must terminate reunification efforts and set the matter for a hearing pursuant to section 366.26 for the selection and implementation of a permanent plan. [Citation.]' " (*Ibid.*)

" 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.] It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.]" (*Celine R.*,

12

*supra*, 31 Cal.4th at pp. 52-53.)  "The court has four choices at the permanency planning hearing.  In order of preference the choices are:  (1) terminate parental rights and order that the child be placed for adoption . . . ; (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care.  (§ 366.26, subd. (b).)  Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.'  (§ 366.26, subd. (c)(1).)"  (*Celine R.*, *supra*, at p. 53.)

### 2. The Parent/Child Relationship Exception

"When the juvenile court finds that the child is adoptable, it must terminate parental rights unless it finds one of four specified circumstances in which termination would be detrimental (§ 366.26, subd. (c)(1)(A)-(D))."  (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 852.)  Our Supreme Court has instructed that "[t]he specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.'  [Citation.]"  (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

At issue in the present case is the parent/child relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i).  This court stated in *In re C.B.* (2010) 190 Cal.App.4th 102, 123-124 (*C.B.*) that "[u]nder section 366.26, subdivision (c)(1)(B)(i), parental rights cannot be terminated where the juvenile court 'finds a compelling reason for determining that termination would be detrimental to the child' because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' "

A parent who claims that the parent/child relationship exception applies, and therefore parental rights should not be terminated, has the burden of proof.  (*C.B.*, *supra*, 190 Cal.App.4th at p. 122.)  To meet this burden, " 'the parent must show more than

13

frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child. [Citation.]' " (*Id*. at p. 126.) As this court has explained, " '[i]nteraction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.]' " (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316 (*Bailey J.*).) " 'The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.' [Citation.] Evidence of 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship. [Citation.]" (*Ibid.*)

In addition, " '[t]he exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond.' [Citation.]" (*C.B.*, *supra*, 190 Cal.App.4th at p. 124.)

Moreover, "[t]he exception's second prong requiring that 'the child would benefit from continuing the [parent-child] relationship' means that 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citation.] The juvenile court 'balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*C.B.*, *supra*, 190 Cal.App.4th at p. 124.)

14

### B.     *Standard of Review*

This court has determined that there is a two-part standard of review for the juvenile court's ruling regarding the application of the parent/child relationship exception provided by section 366.26, subdivision (c)(1)(B)(i). (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)  First, "[s]ince the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental . . . relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination.  Thus, . . . a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.'  [Citation.]  Unless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed." (*Id.* at p. 1314.)

"The same is not true as to the other component of these adoption exceptions.  The other component of . . . the parental relationship exception . . . is the requirement that the juvenile court find that the existence of that relationship constitutes a '*compelling reason* for determining that termination would be detrimental.'  (§ 366.26, subd. (c)(1)(B), italics added.)  A juvenile court finding that the relationship is a 'compelling reason' for finding detriment to the child is *based* on the facts but is not primarily a factual issue.  It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption.  [Citation.]  Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315; accord, *C.B.*, *supra*, 190 Cal.App.4th at p. 123.)

15

## C.  Analysis

The mother and father both contend that there was a beneficial parent/child relationship between the father and the children, and that the detriment to the child caused by severing that relationship outweighed the benefits of adoption.[4]

We first consider whether substantial evidence supports the juvenile court's finding that the father did not have a beneficial parent/child relationship, i.e., that he had "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *Bailey J., supra,* 189 Cal.App.4th at p. 1314.)  As noted above, to meet this requirement, " 'the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits.' " (*C.B.*, *supra*, 190 Cal.App.4th at p. 126.)  The parent must show that he or she has established a "parental role in the life of the child." (*Ibid.*)

The father contends the record shows that M. was attached to him and enjoyed spending time with him, and that their visits were appropriate.  He refers to the letter from the mental health rehabilitation specialist, which noted a "strong" attachment between M. and the father.  The father acknowledges that his relationship with M. was not "a daily parenting role," but he notes that in *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), the court held that a parent need not "prove the child has a 'primary attachment' to the parent," nor "show the parent and the child have maintained day-to-day contact." (*Id.* at p. 299.)

The facts of this case are distinguishable from the facts in *S.B., supra,* 164 Cal.App.4th 289.  In that case, as here, the father had visited the child two to three times per week.  However, in *S.B.,* there was evidence that the child became upset when

---

[4] The mother does not set forth a separate argument on these points; she simply joins in the father's brief, citing to Rule 8.200(a)(5).  The Department asserts that by doing so, the mother "has forfeited the issue."  The Department cites no authority for this proposition, and we decline to find that the mother's joinder in the father's briefing means she has forfeited these arguments.

16

her visits with the father ended and that the child wanted to live with the father. During visits, the child told the father that she loved him and missed him. (*Id.* at pp. 294-295, 298.) The appellate court held that under the circumstances, the juvenile court had erred by finding that the beneficial parent/child relationship exception did not apply. "The record shows S.B. loved her father, wanted their relationship to continue and derived some measure of benefit from his visits. Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]. [Citation.]" (*Id.* at pp. 300-301.)

There was no evidence that M. had a similar relationship with the father. While M. enjoyed some of her visits with the father, the father tended to feed M. during visits rather than play with her, and the social workers did not observe a secure emotional attachment between M. and the father. M. often failed to show any emotion or reaction during her visits with the father, and she often needed to be redirected to spend the visits with the father rather than the social worker. M. also separated easily from the father at the end of the visits.

The instant case is more analogous to *Bailey J., supra,* 189 Cal.App.4th 1308, where, as here, the child was first detained at a very young age. This court held that the mother's "frequent and loving contact" with the child was "insufficient to show the requisite beneficial parental relationship." (*Id.* at p. 1316.) This court characterized the visits as "little more than play dates for him with a loving adult," noting that there was no evidence the child looked forward to the visits and no evidence the child had difficulty separating from her at the end of their visits. "While there was no evidence that the visits themselves were detrimental to Bailey, there was also no evidence that Bailey benefitted from these visits." (*Ibid.*)

In this case, the evidence likewise showed that M. was not strongly attached to the father and that their visits were more akin to "play dates" (*Bailey J., supra,* 189 Cal.App.4th at p. 1316) than components of a "significant parent-child relationship"

17

(*S.B., supra,* 164 Cal.App.4th at p. 299).  M. did not have a primary bond with the father and there was no evidence of any particular benefit she derived from the visits.  This constitutes substantial evidence to support the juvenile court's finding that the father had not established a "parental role in the life of the child" (*C.B.*, *supra*, 190 Cal.App.4th at p. 126) and thus that the beneficial parental/child relationship exception did not apply.

The father further argues that the benefits of his relationship with M. outweighed the benefits of adoption.  He contends it was detrimental for M. to lose her "strong attachment" to him.  He argues that even if he was not ready to have M. returned to his custody, the trial court should have allowed him to maintain his relationship with M. through a permanent plan of guardianship or long-term foster care.

The cases that the father relies on are distinguishable.  For instance, in *In re Jerome D.* (2000) 84 Cal.App.4th 1200 (*Jerome D.*), the child's prospective adoptive parent was the mother's ex-boyfriend, who had "serious shortcomings as a caretaker" (*id.* at p. 1208) and with whom the child "seemed lonely, sad, and the stepchild or 'the odd child out' " (*id.* at p. 1206).  Additionally, the child was nearly nine years old at the time of termination of parental rights, he had lived with the mother until age six and a half, and he had a strong attachment to her.  (*Id.* at p. 1207; see also *In re Scott B.* (2010) 188 Cal.App.4th 452, 471 ["very close relationship" between 11-year-old child and mother, coupled with the child's "emotional instability and his repeated insistence that his preference would be to live with Mother," presented a compelling reason for finding that termination of parental rights would be detrimental].)

In *In re Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M.*), the mother "acted in a loving, parental role with the children," who were very strongly attached to her.  (*Id.* at p. 690.)  At the time of the permanency planning hearing, the children were seven, nearly five, and nearly three years old.  (*Id.* at p. 689.)  If the three children were freed for adoption, they would have been separated into two different homes.  Thus, "the maintenance of mother-child and sibling relationships" would depend solely on the

18

continued goodwill of the prospective adopters.  (*Id.* at p. 691.)  Under the circumstances, the record showed "a beneficial parental relationship that clearly outweigh[ed] the benefit of adoption."  (*Id.* at p. 690.)

Here, M. was placed with caregivers with whom she had developed a strong bond and with whom she was very happy.  (Compare *Jerome D., supra,* 84 Cal.App.4th at p. 1206.)  The caregivers were in the process of adopting all three of M.'s siblings.  (Compare *Amber M., supra,* 103 Cal.App.4th at p. 691.)  Further, M. had been removed at seven months old.  She was only two years old at the time of the permanency planning hearing, and she did not have nearly as strong of an attachment to the father as the children had to the parents in *Jerome D.* and *Amber M.*  Under the circumstances, the record does not support the father's claim that M. had such "a substantial, positive emotional attachment" with the father such that she "would be greatly harmed" by termination of parental rights.  (*C.B.*, *supra*, 190 Cal.App.4th at p. 124.)

In sum, the record supports the trial court's determination that the beneficial parent/child relationship exception did not apply in this case.

## IV.  DISPOSITION

The June 11, 2013 orders terminating parental rights and selecting adoption as the permanent plan are affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
PREMO, J.

_____
GROVER, J.

20