Filed 3/23/26  In re K.C. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>In re K.C. et al., Persons Coming Under the Juvenile Court Law.</td><td></td></tr>
<tr><td>ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>         v.<br><br>J.C.,<br><br>     Defendant and Appellant.</td><td>A172864<br><br>(Alameda County<br>Super. Ct. Nos. JD03730901,<br>JD03731001, JD03731101,<br>JD03731201)</td></tr>
</table>

J.C., the father of four children who are the subjects of ongoing dependency proceedings brought under Welfare and Institutions Code section 300, et seq.,[1] appeals from the juvenile court's disposition/jurisdiction order (issued in all four dependency cases) based on a single claim:  That the Alameda County Social Services Agency (Agency) and the juvenile court failed in their Indian Child Welfare Act (ICWA) duties because they did not

---

[1] Undesignated statutory citations are to the Welfare and Institutions Code.

1

make sufficient inquiries and follow proper procedures regarding the children's possible Native American heritage.

The Agency concedes that it did not make sufficient inquiries up to this point. Nonetheless, it argues, we should dismiss this appeal because father's claim is not ripe, since the Agency and the court have an ongoing duty to make all relevant ICWA inquiries and have recognized that obligation.

We agree with the Agency. Father's claims of procedural improprieties are based on the heightened standards that apply when there is a "reason to know" a child is "Indian" as that term is statutorily defined. At this point, the record indicates only that the Agency and the court have a "reason to believe" that the children might be "Indian," which creates an ongoing duty to make relevant inquiries. The record indicates that everyone involved with this proceeding is aware of that ongoing duty, and at this point it is premature to say whether it has been discharged. We shall therefore dismiss the appeal as nonjusticiable for lack of ripeness.

## I. BACKGROUND

In March 2024, the Agency filed a section 300 petition on behalf of four siblings: 11-year-old Key.C., nine-year-old Kel.C., six-year-old Ka.C., and two-year-old O.C. The Agency alleged that their mother (who is not a party to this appeal) and father were physically abusing the children; that due to physical abuse, Ka.C. had attempted to harm himself; that the parents had left the children alone for long periods of time with little or no food; that mother repeatedly gave them marijuana and alcohol when they lived in Florida, before they moved to California in September 2023; and that mother and father exposed the children to their domestic violence.[2]

---

[2] On February 25, 2025, the Agency filed an amended petition, adding a "no provision for support" allegation under section 300, subdivision (g),

2

The Agency indicated that it had questioned mother and father and had reason to believe the children might be Indian, having been told the children's mother, maternal grandparents, or maternal great-grandparents are or were members of the Cherokee, Blackfoot, or unknown tribes.

The children were removed from parents' physical custody on March 6, 2024. In a March 11, 2024 detention report, the Agency repeated the information about the children's possible Indian status. It added that the paternal grandmother, Beatrice, said there was Native American ancestry on father's side, and that the name of the tribe was unknown.

At a March 11, 2024 detention hearing, mother stated that she might have Native American ancestry. Asked by the court if she knew any family members were enrolled in a tribe, she said, "So from my understanding from the information I gathered this weekend, . . . great-great-grandmother, . . . but she's deceased and my father just passed in 2022. So I'm having to reach out to family members that I don't know to, like, obtain all those kinds of documents." Father said he had told the Agency he had Native American ancestry on his father's side, although he did not know what tribes were involved. The court indicated that ICWA-020 forms needed to be filled out for the parents, that "[p]ursuant to California Rule of Court 5.664(d), there may be ICWA for both mother and father,"[3] that "[w]e're going to send out whatever notices we can get," and that "dad can provide us with a little more information as well." The children were put in the temporary care and custody of the Agency pending further disposition.

---

alleging that the parents had been arrested several weeks before and extradited to Florida to face criminal charges related in part to child abuse and neglect.

[3] It is unclear what the court intended to cite to in the California Rules of Court, as rule 5.664(d) has nothing to do with Indian children or ICWA.

On the same day as the detention hearing, March 11, 2024, mother filed with the court a Parental Notification of Indian Status form stating that she was or might be a member of the "Cherokee and Blackfoot" tribes.

In an April 2, 2024 jurisdiction/disposition report, the Agency reported regarding mother's information that it had sent a notice of hearing to the "Cherokee tribes" that day, and that it did not need to send notice to the "Blackfoot tribe" because it was not a federally recognized tribe. Regarding father's information, the Agency had sent a notice of hearing to the Bureau of Indian Affairs (BIA).

The Agency filed documents with the court that same day that indicate it sent notice to the BIA and the Eastern Band of Cherokee Indians, the United Keetoowah Band of Cherokee Indians, and the Cherokee Nation. In these documents, the Agency indicated there was "[n]o information available" for any grandparents, great-grandparents, or great-great-grandparents of the children, and it did not provide any other information on possible Indian ancestry or other lineal biological ancestors.

In its jurisdiction/disposition report, the Agency gave no indication that it made any effort to inquire with anyone other than mother and father about the children's Native American heritage, even though it also reported that the parents had identified numerous relatives. Mother told the Agency she had 28 siblings and identified three by name, as well as an aunt and cousin, with whom mother said she was closest. Mother also said she had close relationships with Beatrice (her mother-in-law), two sisters-in-law, and a brother-in-law, whom she also identified. The Agency reported that father identified the cities in Florida where his father and mother lived, as well as the geographic locations of three brothers and two sisters, all identified by name in the Agency's report.

4

A contested disposition/jurisdiction hearing was held over multiple sessions, but it was not completed until January 2025, and the court did not rule until February 14, 2025. In the meantime, there were further ICWA-related events.

In June 2024, the Agency filed with the court written replies to its notice of hearing from the Cherokee Nation and the United Keetoowah Band of Cherokee Indians. These responses stated the children did not meet the definition of "Indian children" with regard to those tribes.

Subsequently, at a June 26, 2024 session of the contested disposition/jurisdiction hearing, mother clarified that she had reported to the Agency that she had Black*feet* ancestry, not Black*foot* ancestry. The court stated that notice to the Blackfeet Tribe should be done "forthwith." Accordingly, in July 2024, the Agency sent a notice of hearing to the Blackfeet Tribe (as well as to the Bureau of Indian Affairs). Once more, the Agency indicated that there was "[n]o information available" for any grandparents, great-grandparents, or great-great-grandparents of the children, and the Agency did not provide any other information on possible Indian ancestry or other lineal biological ancestors.

In a September 2024 addendum to its jurisdiction/disposition report, the Agency indicated that in July 2024, a "placement preservation CFT meeting" via telephone was held regarding the children. At the family's invitation, "several family members and extended family support" participated in the meeting. The Agency gave no indication that it inquired of these family members about the children's possible Native American heritage.

The Agency also stated it had contacted the Blackfeet Tribe requesting an update on their findings, and that one was pending. In October 2024, the

5

Agency filed with the court the Blackfeet Tribe's response regarding O.C.; the parties do not identify, and we have not found in the record, the tribe's responses regarding the other three children. The tribe indicated that O.C. was not an Indian child with regard to it.

The parties do not cite to, and we have not found, any place in the record where the parties or the court subsequently referred to ICWA.

On February 14, 2025, the court issued its ruling. It sustained the petition as amended to conform to proof after trial and, among other things, declared the children dependents of the court; found by clear and convincing evidence that they had to be removed from their parents' physical custody to protect them; committed their care, custody, and control to the Agency for suitable placement; and ordered reunification services for the parents. It also ordered the parents to give the Agency all known identifying information of the children's relatives, and stated that "[t]he Agency has thus far exercised due diligence to identify, locate, and contact relatives." It did not state anything about ICWA.

On March 18, 2025, father filed a timely notice of appeal from the court's jurisdiction/disposition order.

## II. DISCUSSION

Father "requests that this Court reverse the findings that the Agency and the courts made reasonable efforts to comply with the ICWA and that the ICWA did not apply to the children, and remand for proper compliance under the ICWA." He further requests that, if on remand the children are found to be Indian, the court's jurisdiction and disposition rulings be reversed and new hearings be conducted applying the heightened burden of proof required by ICWA.

6

Father's requests are flawed for multiple reasons, not the least of which is that they are premised on a falsehood: the juvenile court made no such findings about reasonable efforts or that ICWA did not apply. Rather, as the Agency points out—and as father acknowledges elsewhere in his briefing in contradiction to the relief he seeks)—the juvenile court has not made any findings or rulings regarding the Agency's ICWA inquiries or whether or not ICWA applies to the children. Based on the Agency's and the court's ongoing obligation to inquire about ICWA, father's failure to establish that the court is required to rule on the application of ICWA at the disposition stage, and ample case law, we agree with the Agency that father's appeal is premature and should be dismissed.

## A. *Legal Standards*

Enacted in 1978, ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards a state court must follow before removing an Indian child from his or her family. (25 U.S.C. §§ 1902; *In re Dezi C.* (2024) 16 Cal.5th 1112, 1128–1129 (*Dezi C.*).) Consistent with ICWA, our state's analogue, the California Indian Child Welfare Act (§ 224 et seq; Cal-ICWA), provides that "courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases." (§ 224.2, subd. (a); *Dezi C.*, at p. 1125; Cal. Rules of Court, rule 5.481.)

ICWA defines an " 'Indian child' " as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (b) [adopting the federal definition].)

7

There are three distinct duties regarding ICWA in dependency proceedings. "First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id*., subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id*., subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

More specifically, there is a "reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe." (§ 224.2, subd. (e)(1).) In such a circumstance, "further inquiry is necessary to help the court, social worker, or probation officer determine whether there is reason to know a child is an Indian child," including "[i]nterviewing the parents . . . *and extended family members* to gather the information required," "[c]ontacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member or citizen, or eligible for membership or citizenship in, and

8

contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility." (§ 224.2, subd. (e)(2)(A), (B), (C), italics added.) "Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C).)

"If the court makes a finding that proper and adequate further inquiry and due diligence . . . have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings . . . ." (§ 224.2, subd. (i)(2).) "The court shall reverse its determination if it subsequently receives information providing reason to believe that the child is an Indian child and order the social worker or probation officer to conduct further inquiry as described in Section 224.3." (*Ibid*; see also *id*., subd. (j).)

There is a "reason to know" a child is Indian if, as relevant here, "[a] person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child"; "[a]ny participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child"; or "[t]he court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d)(1), (3), (6).) Having a reason to know triggers heightened inquiry and notice requirements. (See, e.g., *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1165.)

9

**B.** *Analysis*

As a preliminary matter, father here and there in his briefing cites the heightened procedural standards that must be applied when there is a "reason to know" a child is Indian. He fails to establish that there is such a reason to know here. The information disclosed by the children's parents—which indicated only the possibility of tribal affiliations—establishes only that the Agency and the court had reason to believe that the children might qualify as Indian children. Therefore, there was a duty to make further inquiries, including of extended family members. But father's effort to show error based on the heightened "reason to know" procedural standards is unpersuasive because these standards do not apply at this point in the proceedings.[4]

The Agency recognizes its ongoing duty of inquiry and concedes that it did not engage in sufficient inquiries up to this point. That is certainly the case. Its failure to make ICWA-related inquiries beyond the children's parents is particularly notable in light of the ample information about extended family members that the parents provided, as well as the participation of extended family members in a July 2024 meeting by phone regarding the children's placement.

The record indicates the juvenile court was aware of its duty but made no ICWA findings at the conclusion of the jurisdiction/disposition hearing. It discussed ICWA at the detention hearing and early in the disposition/jurisdiction hearing, for example pointedly instructing the Agency

_____

[4] For this same reason, father's request in his opening brief that we take judicial notice of a Bureau of Indian Affairs document defining "active efforts" under title 25, sections 23.2 and 23.120 of the Code of Federal Regulations is denied. Such efforts are only relevant when the proceedings involve an Indian child. (See, e.g., *In re C.B.* (2010) 190 Cal.App.4th 102.)

10

to notify the Blackfeet Tribe upon mother's clarification that she understood she had some Blackfeet heritage.  That the juvenile court did not make any ICWA findings at the conclusion of the jurisdiction/disposition hearing would not be unreasonable if, as the record suggests, the Blackfeet Tribe had yet to respond to the Agency's inquiry about three of the four children's tribal affiliation, including after the Agency had requested an update from the tribe.  Regardless, father offers no legal authority establishing that the court was required to do so at so early a stage of the proceedings and, therefore, fails to show error.  (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655 ["appellant has the burden to prove [error] by presenting legal authority on each point made and factual analysis . . . ; otherwise, the argument may be deemed forfeited"].)

Father further contends that the Agency has failed to make the requisite inquiries.  He argues based on *Dezi C.*, *supra*, 16 Cal.5th 1112, that we should order a conditional reversal of the court's jurisdiction and disposition orders and remand "for proper compliance with ICWA."

In *Dezi C.*, our Supreme Court resolved a split among our appellate courts regarding the proper standard to apply in assessing the prejudicial effect of a child welfare department's failure to comply with its Cal-ICWA inquiry duties.  (*Dezi C.*, *supra*, 16 Cal.5th at p. 1125.)  The court held that "error resulting in an inadequate initial . . . inquiry requires conditional reversal" because " '[u]ntil an agency conducts a proper initial inquiry and makes that information known, it is impossible to know what the inquiry might reveal.' " (*Id.* at p. 1136.)  Remand should be accompanied by "directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in compliance with [California Rules of Court,] rule 5.481(a)(5), and when necessary, comply with

11

the notice provision of section 224.3." (*Id.* at p. 1136.) "If, upon review, a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law [citation], there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child. On the other hand, if the inquiry is inadequate, conditional reversal is required so the agency can cure the error and thereby safeguard the rights of tribes, parents, and the child." (*Id.* at p. 1141.)

*Dezi C.* is distinguishable from the circumstances here in two critical respects. First, it involved a juvenile court finding (made upon the parents denying any Indian heritage) that ICWA did not apply to the case. (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1126–1127.) Here, the juvenile court made no such finding.

Second, *Dezi C.* involved an appeal from a ruling late in the proceedings, the juvenile court's order terminating parental rights. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1126.) Here, on the other hand, father appeals from the juvenile court's jurisdiction and disposition orders, which include providing reunification services and affording ample time to make further ICWA-related inquiries of the parents and extended family members.

In similar circumstances, multiple appellate courts have concluded, as the Agency argues, that it is premature to rule on a claim of ICWA error. As one court put it, "[s]o long as proceedings are ongoing and all parties recognize the *continuing* duty of ICWA inquiry, both the Agency and the juvenile court have an adequate opportunity to fulfill those statutory duties." (*In re S.H.* (2022) 82 Cal.App.5th 166, 179 [rejecting claim of a failure to conduct proper initial inquiry under ICWA on appeal from a

12

jurisdiction/dispositional order and affirming the order]; accord, *In re T.R.* (2023) 87 Cal.App.5th 1140, 1154 ["Because this case is ongoing and the department and court are under a continuing duty to inquire whether [the children] may be Indian children, [the father]'s claim of inadequate inquiry isn't ripe"]; *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 637 [rejecting the parties' joint stipulation for remand and dismissing an appeal from jurisdiction and disposition orders as moot because the stipulation only sought a remand with directions to order ICWA compliance]; see also *In re Dominick D.* (2022) 82 Cal.App.5th 560, 567 ["ICWA inquiry and notice errors do not warrant reversal of the juvenile court's jurisdictional or dispositional findings and orders" other than reversal of the improper ICWA finding itself].)  We agree with this approach, and will dismiss this appeal as raising only an ICWA claim that is not ripe for review.

### III. DISPOSITION

The appeal is dismissed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
MOORMAN, J.*

---

\* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.